STRIKE *vs.* M'DONALD & SON.—June, 1828.

A final decree, or a decretal order passed by the court of chancery, or the county court *as a court of equity,* from which an appeal might have been taken within a limited period, after the expiration of such period, in the further progress of the cause in which it was pronounced, and in the ab-sence of any other ground of error than what the prior proceedings them-selves disclosed, will be considered as conclusive upon the rights of the parties, as well in the court of original jurisdiction, in which further pro-ceedings were necessary to carry such decree, or order, into execution, as in the appellate court to which the case was ultimately carried.

Where a cause was transmitted from *Baltimore* county court to the court of chancery under the act of 1824, *ch.* 196, the chancellor properly viewed all the proceedings as having taken place in the same tribunal.

A decretal order should be appealed from within nine months from the time of making it by the terms of the act of 1785, *ch.* 72, *s.* 27.

The enlargement of the equity jurisdiction of the county courts gave them powers concurrent with those of the court of chancery, and necessarily took with it all the laws and regulations relating to equity matters in that high tribunal.

The right of appeal from a decretal order of the court of chancery is not a permissive privilege to be exercised or not in the election of the party, and postponed at his pleasure until the final decree.

Whoever comes into the possession of an estate by fraud must account for rents and profits when the fraudulent conveyance is vacated.

Where a decree annulled certain deeds as fraudulent, and ordered the pro-perty mentioned in them to be sold, and reserved all equities as to the distribution of the proceeds for hearing on the trustee's report of the sale being filed, this reservation was held to have no view to the interest of the fraudulent grantee; and the deeds having been vacated, because they originated in a fraudulent combination to cheat creditors, were con-sidered as void *ab initio,* and wholly wanting in legal fitness to stand as securities for any advances whatsoever.

If a man has acted fraudulently and is conscious of a defect in his title, and with that conviction on his mind expends a sum of money in improvements, he is not entitled to avail himself of it.

According to the course of the court of chancery, where the proceeds of property ordered to be sold for the payment of creditors, are insufficient to pay all, the interest is to be calculated only up to the day of sale. Per BLAND, Chancellor.

Where a creditor files a bill, for the purpose of subjecting the property of his debtor to the payment of his own claim, and of all others who may obtain permission to come in, and participate in the burthens and the benefits, the others are allowed to come in, at any time either before or after the decree; and it is most usual and proper, that the decree itself should command the trustee to give notice at the time of advertising the property for sale, to all creditors to bring in their vouchers *Ib.*

When a bill is brought upon an equitable title, and there is a trust, and in the case of an infant, or where there has been any fraud, or in cases of dower, an account of the rents and profits will be ordered, and that from the time the title accrued until the defendant was put out of possession. *Ib.*

In what is commonly called a creditor's bill, and where two or more creditors bring such a bill, or others come in afterwards, the adjustment of their rights and interests in relation to each other, and the objections which the defendants may make against those who have come in after the institution of the suit, remain to be considered and decided when the court is called on to make distribution of the fund. *Ib.*

Other creditors than the complainants in a bill may come in, and claim payment of their debt out of the proceeds of their debtor's property, although the bill itself contains no allegation that it was originated for their benefit, and the practice of this state is to allow them to come in and participate, by merely filing the vouchers of their claims with the register. *Ib.*

With regard to the proof of claims brought in by other creditors, the practice is as in cases of deceased persons estates to require no higher proof than such as would induce the orphans court to allow the claim according to the testamentary system, when no objections are made. *Ib.*

It is competent for the originally suing creditors to rely upon the statute of limitations, in opposition to the claims of other creditors, who have come in since the institution of the suit; but in applying the statute of limitations in such cases, it must be with all its saving provisos and also subject to the resuscitatory qualifications of such acknowledgments as are deemed sufficient to take a case out of the statute. *Ib.*

A creditor cannot introduce other particulars and causes of action of a different description not mentioned or alluded to in his bill, after a decree, by a mere *ex parte* petition; if he intended to have relied on them, he should have amended his bill before decree. *Ib.*

The filing of the schedule of an insolvent debtor by one claiming to be a creditor, cannot be considered as filing a voucher of his claim. *Ib.*

When a commission from the court of chancery to take testimony, is returned, according to the practice of this state, it is opened by the chancellor, or the register, and objections of every kind to the evidence are taken and considered at the hearing of the cause. *Ib.*

APPEAL from the Court of Chancery.   The bill in this case was filed on the 25th of February 1817, in *Baltimore* county court, by the appellees, (the complainants in that court,) against the appellant and *John Rogers*, (the defendants therein;) and afterwards, under the act of 1824, *ch.* 196, the proceedings were, at the instance of the complainants, transmitted to the court of chancery, on the 15th of June 1825.   The bill stated, that some time previous to the year 1811, *John Rogers*, stone mason in the city of *Baltimore*, entered into partnership with *Robert Henderson*, merchant of the said place, for the purpose of carrying on the flour and milling business, under the title of *Henderson & Rogers.*   That *Henderson* and *Rogers* in carrying on their said business contracted considerable debts, among which was one contracted with the complainants in the purchase of wheat, which then amounted to about $6,000. That *Henderson & Rogers* becoming embarrassed in their affairs, *Rogers*, for the purpose of preventing his private property from being made responsible for the debts of the said firm, on or about the 16th of January 1811, assigned to *Nicholas Strike*, of the said city, two certain lots or parcels of ground situate in *Pratt-street* in the said city, with their appurtenances, for the term of ninety-nine years; which assignments were exhibited marked No. 1, and 2.   That the complainants have every reason to believe that there was no *bona fide* sale of the said lots by *Rogers* to *Strike;* that no consideration passed between the said parties as for a sale of property; *that if Strike paid Rogers any money, it was subsequently and by way of loan on the security of the said deeds; and that the said assignments were understood by the parties expressly to be made to avoid the payment of the creditors of Rogers, or of Henderson & Rogers.*   That as an evidence that the said deeds executed by *Rogers* to *Strike* were not intended to be absolute, but only intended to secure the same against the creditors of *Rogers;* and that the monies paid by *Strike* to *Rogers* were paid only upon the security of the deeds, which had been previously executed.   That a considerable part of the said money was expended by *Strike* upon the said property contained in the deed marked No. 2, as an exhibit, after the execution thereof, and charged *Rogers* as part of the purchase money; and that another

portion of said pretended purchase money was expended by *Rogers* in erecting a furnace and other permanent buildings on the property contained in the deed made marked No. 1, as an exhibit.    That *Rogers*, notwithstanding the said deeds, for two years after the dates thereof continued to receive the rents thereof, and also to pay the taxes thereon, and the ground rent which was due on the same.    *That Strike, not considering the deeds absolute, has often promised Rogers, to reconvey the same on the repayment of the amount paid by him on account of the execution of the said conveyances.    That part of the alleged purchase money for said lots and houses was a sum of money paid by Strike to Col. Jacob Small, long after the execution of the said deeds; and even after Rogers' application for the act of insolvency, which was in October* 1812, when *Strike* was appointed trustee for his creditors. That *Strike,* long after the date of said deeds, which is on the same day and year, drew up his account against *Rogers,* showing the manner in which he had expended, and *Rogers* received to the amount of the said nominal consideration in the said deeds mentioned, which the complainants pray *Strike* may be compelled to produce, by which the said mode of payment by *Strike* for said lots will satisfactorily appear as above stated.    That *Rogers,* about October 1812, in consequence of his pecuniary difficulties, applied to *Baltimore* county court for the benefit of the acts of insolvency of this state; on which occasion the said parties procured *Strike* to be named by the said court trustee of the effects of *Rogers,* for the purpose of better concealing the above mentioned fraudulent assignments of said property by *Rogers* to *Strike.*    The relief sought by the bill was, that the deeds from *Rogers* to *Strike* might be declared null and void; that the property be sold for the benefit of the creditors of *Rogers,* and of *Henderson* and *Rogers*; and that *Strike* should account for the rents and profits.    The bill, after stating certain interrogatories to be answered, also prayed for general relief.

The *Exhibit* No. 1, is a deed from *John Rogers* to *Nicholas Strike,* dated the 16th of January 1811, whereby, in consideration of $500, *Rogers* conveyed to *Strike,* and his heirs, executors, &c. all and singular that piece or parcel of ground, situate, lying and being, in *Baltimore* county aforesaid, and near

the said city of *Baltimore*, which is contained within the following metes and bounds, courses and distances, to wit: Beginning for the same, at, &c. "To have and to hold all and singular the said before described piece or parcel of ground, buildings, improvements and premises, hereby assigned. transferred and set over, or meant or intended so to be, with the rights and appurtenances thereunto belonging, to the use of the said *Nicholas Strike*, his heirs, executors, administrators or assigns, from henceforth, for and during all the rest, residue and remainder, of the original term therein of ninety-nine years, which is yet to come and unexpired, and fully to be complete and ended, with the said benefits of renewals of the original lease and term from time to time forever; and of purchasing the same in fee simple, or otherwise, as herein before is mentioned, in as full, large, ample, and beneficial a manner, to all intents and purposes whatever, as the same could have been had, held and enjoyed, by the said *John Rogers*, his heirs, executors, administrators, or assigns, in anywise, under and subject, nevertheless, to the payment of the yearly rent or rents, as the case may be, and to a proportion of the fines for renewals, covenants and conditions, in and by the original indenture of lease thereof mentioned and expressed, and for and in respect of the said hereby assigned piece or parcel of ground and premises, to be paid, observed, performed and kept," &c. There was also a covenant for further assurances, and that *Rogers* had done no act to incumber the premises.

The *Exhibit*, No. 2, was a deed from *John Rogers* to *Nicholas Strike*, dated the 16th of January 1811, reciting an indenture of lease from *Nicholas Rogers* to *Hiram Cochran*, of the 19th of December 1796, for the term of ninety-nine years, renewable forever, of all that lot or parcel of ground, situate, lying and being, on *Pratt-street*, in *Baltimore-Town*, (now the city of *Baltimore*,) which is contained within the following metes and bounds, to wit: Beginning, &c. subject to the payment of the yearly rent of £12 10. That *Cochran* had assigned the premises to *Robert Henderson*, who had assigned the same to *John Rogers*, &c. That in consideration of the sum of $1900, *Rogers* granted and transferred to *Strike* the above described premises, "To have and to hold the same, and

every part and parcel thereof, unto the said *Nicholas Strike,* his heirs, executors, administrators and assigns, for and during the rest, residue and remainder, of the term of years therein yet to come and unexpired, by virtue of the original lease thereof, with the benefit of renewal thereof, from time to time forever, in as full, large, ample, and beneficial manner, to all intents and purposes whatsoever, as the said *John Rogers* might or could have held and enjoyed the same by any ways or means whatsoever, subject nevertheless to the payment of the yearly rent or sum of twelve pounds ten shillings current money, and performance of the covenants in the said recited indenture contained." There was also a covenant that *Rogers* had done no act to incumber the premises, and also for further assurances.

The answer of *Strike* stated, that he does not know at what time the said *John Rogers,* and *Robert Henderson,* entered into copartnership, nor how long said copartnership continued. That he hath no knowledge of any contract made between the complainants, and *Henderson* and *Rogers,* nor what sum of money was due, or is now due, by the said *Henderson* and *Rogers,* to the complainants, or if any money is due by them to the complainants. He stated, that on the 16th of January 1811, *Rogers,* by his two several deeds of assignment of that date, *did bargain, sell and assign, to this defendant,* the two several lots and parcels of ground, therein particularly described, *for the consideration money therein mentioned,* which said deeds were duly executed, acknowledged and recorded, according to law, as by the said original deeds therewith filed, will more at large appear. That the said sale of the said two lots mentioned in the said deeds, was *a bona fide sale, and that the full consideration* money set forth in the said deed, to *John Rogers.* That *John Rogers* and *Robert Henderson,* nor *either of them, were not indebted to him previous to the execution of said deeds,* and *that the said deeds, or either of them, were not executed to him, to cover any loans of monies due by Rogers* and *Henderson,* or either of them, to this defendant; and that the said deeds, and the lots of ground thereby conveyed, *were not executed to this defendant in trust, or by way of mortgage or security, or to evade the claims of the creditors of Henderson and Rogers,* or the creditors of either of them;

but this defendant saith, that he purchased the said *lots of ground as aforesaid, absolutely for his own use, and paid for the same out of his own monies.* That after he had purchased said lots of ground, and had obtained a conveyance for them, he improved one of the said lots, by erecting additional buildings thereon, which said improvements, were erected at his own charges; and he never did charge *Rogers* with the expenditure of the said buildings and improvements. That after he had obtained the said deeds, and possession of the said lots, he leased one of them for a term of years, and that the tenants did erect a furnace on one of the said lots, and that *Rogers* did not erect the said furnace, and it is no advantage to him, inasmuch as the tenants have a right to remove the said furnace, at the expiration of the said term. That *Rogers*, after the said purchase, never did receive the rents of the said property, with the consent of this defendant, nor pay taxes and ground rents, due on the said lots. He denies that he ever promised *Rogers* to reconvey the said property to him, upon his repaying the amount of the purchase money paid by this defendant for the same. That he never paid to Colonel *Jacob Small*, any monies for part of the purchase money of the said lots; but he paid the *whole purchase money to Rogers.* That he did make an estimate or account of sundry sums of money, showing what the said lots of ground stood him in, and he showed to *Henry W. Rogers*, Esq. counsel for the complainants, who called on this defendant, to inquire how this defendant held the said property, a rough paper containing such estimate of what said property and improvements cost him, but this defendant alleges, that he took no particular care of the said paper, and now cannot lay his hands upon it. That *Rogers* did obtain the benefit of the insolvent laws of this state; and that this defendant was appointed his trustee, for the benefit of *Rogers'* creditors. That he, as trustee, never did receive any property of any description belonging to the estate of *Rogers*. He refers to the insolvent proceedings filed by said *Rogers* in this court, which will show the amount of property delivered in the schedule of *Rogers* for the benefit of his creditors. That *Rogers* did remain in one of said houses, on one of said lots, for sometime after this defendant had purchased the same, as the tenant of this defendant;

and he, *Rogers*, failing to pay the rent thereof, this defendant levied a distress for such rent in arrear, and sold the goods of *Rogers*, for said rent in arrear, and was paid the same by the officer who executed the said distress. He denies all fraud and combination as set forth in the bill of complaint.

The answer of *Rogers* stated, that he entered into partnership with *Robert Henderson* about the year 1807 or 1808, and that they carried on the flour and mill business until the year 1811, when they failed in consequence of the failure of certain mercantile houses which were largely indebted to them. That he had been a stone mason by trade, and at the time of entering into partnership was possessed of the two lots mentioned in the deeds mentioned in complainants' bill, and of nearly ten thousand dollars in cash, which were carried into the partnership funds. That at the time of entering into this partnership he supposed *Henderson* to be in flourishing circumstances, and clear of debt, but afterwards found that he was much incumbered with heavy debts contracted before the partnership was formed. That a few days after the failure of *Henderson & Rogers*, this defendant executed to *Nicholas Strike* the deeds No. 1 and No. 2, exhibited by the complainants, in order to secure the property therein contained for the benefit of the creditors of *Henderson & Rogers*, and of this defendant's own creditors, &c. in order to save the same from the creditors of *Henderson* before the partnership, and upon a special confidence and trust for these purposes, as well as to preserve the surplus, after payment of these debts, for this defendant and his family. That this was the understanding and agreement between this defendant and *Strike*, who did not pay, or agree to pay, any part of the money which was the nominal consideration of said deeds. That the said conveyances were not intended, or in any manner designed by the parties thereto, to operate as a sale of the property, or to become such in any event, but only as a conveyance in trust for the purposes above mentioned. That this defendant, after the failure of the house, returned to his trade, giving up all concern or attention to the winding up of the affairs of the partnership. believing that these effects and his own would probably be sufficient for the payment of the debts; but being afterwards sued and pressed

by the creditors, he was obliged in 1812 to apply for the bene-
fit of the insolvent laws, when he obtained a release of his per-
son, and *Strike* was appointed trustee for the benefit of his
creditors, as being already in possession of the principal part
of defendant's property. That defendant has not since prose-
cuted his application, in order to obtain a final discharge, being
willing and desirous that all his just debts should be paid, and
believing that the property was sufficient for the purpose; that
in fact, the creditors are now all satisfied, as this defendant be-
lieves, except the complainants and *John Okely*, to whom a
small balance is still due, and that the complainants received
but a small payment on their debt, which amounts, as this de-
fendant believes, to nearly $6000. That at the time when the
deeds were made to *Strike*, the property conveyed by them
was worth much more than the sum expressed as the considera-
tion money in them, and that the complainants then offered to
take them at the price of $4000; but that at present they are
worth, as defendant believes, more than twice that sum. That
at the time of executing the said deeds, the improvements on
the lot, conveyed by deed, marked as complainants' exhibit No.
2, consisted of a good dwelling-house, in which this defend-
ant resided, and in which he continued to reside about eighteen
months after the date of said conveyance, without any con-
tract, agreement or understanding with *Strike*, or any demand
or suggestion of paying rent for the occupation of the premises.
That the improvements on the other lot, exhibit No. 1, con-
sisted at the time of said conveyances, of two small frame
dwelling-houses, occupied by tenants, and a cooper's shop,
which was then unoccupied. That this defendant continued to
receive the rents from the tenants of said two houses, for his
own use, for more than eighteen months after the date of said
conveyances to *Strike*, without any hindrance, demand or mo-
lestation from *Strike;* and that he, this defendant, constantly
paid the ground rents, taxes, and all other dues incident to
ownership on lot No. 2, during the time of his residence in the
house thereon, and on No. 1, for a long space of time after-
wards. That during this period, being desirous to engage in a
more profitable employment, he borrowed of *Strike*, from time
to time, about $1700, which he laid out in erecting a furnace

on lot No. 1, which he carried on about two years and an half, in conjunction with *Henry M'Ardle* and *Patrick Coulson*, to whom *Strike* granted a lease for ten years, at the rent of $80, which was only the amount of the ground rent payable on said lot, on which, besides, were the houses above mentioned; the one renting for $60, and the other for $48, per annum, which rents were received by this defendant. That about the time when the defendant was engaged in erecting said furnace, he was persuaded by *Strike* to give up the house on lot No. 2 to him, in order to remove into one more conveniently situated for his business in the furnace, being assured by him that the rent which he should receive from *Strike* would be sufficient to pay the rent of the house which he might take; that he accordingly surrendered his house to *Strike*, who has ever since resided in it, and removed into one higher up the street; that before he left his house, being then very much embarrassed in his affairs, he was persuaded by *Strike*, in order to save his household goods from executions by creditors, to consent to a colourable distress for rent upon his effects, which was accordingly made, and a fictitious sale of his goods had, under a warrant of distress, *Strike* advancing the money to a mutual friend, one *Patrick Coulson*, to purchase them in for the use of this defendant, and *Coulson* handing back the money to *Strike* after the apparent sale had taken place, while the goods remained all the time in the undisturbed possession of this defendant, who sold and disposed of them afterwards, at his pleasure, without any demand or claim by either *Coulson* or *Strike* against this defendant, or each other, on account of the transaction. That after *Strike* took possession of the house, he made various repairs and improvements on it, and about eighteen or nineteen months afterwards, he rendered an account to this defendant, charging him with the expenses of the same, amounting to about $500, and also with the money loaned to him for the building of the furnace, as well as certain other small sums, which he had from time to time lent to this defendant, amounting in the whole, as nearly as he can recollect, to about $3000; and then assured this defendant, as he had often done on other occasions, that on payment of the sums charged in this account, he would reconvey the whole property to him. That this ac-

count, which he prays *Strike* may be compelled to produce, was made out in the handwriting of *Strike*, but without date; and that defendant signed it, and returned it to *Strike*. That this defendant afterwards, although the money expended on the house by *Strike* was entirely unauthorized by him, got the money, and tendered the amount of the account to *Strike*, urging him to reconvey the property to him, and that *Strike* turned away without receiving the money, or making any answer, and has ever since refused to reconvey the property to this defendant, although he has been informed, that he has admitted to others that he held the same in trust for this defendant and his family, and was willing to convey it to them on payment of the sum due to him from this defendant. This defendant further states, that at the time when he executed those deeds, neither he, nor the house of *Henderson & Rogers*, owed any thing to *Strike;* and that the said conveyances were not made in contemplation of future advances of money from *Strike*, although he afterwards received advances from him; but that the said conveyances were entirely voluntary, and without consideration, and for the uses and trusts above mentioned; and in order that the same may be applied to the payment of his just debts, and those of the firm, contracted after he entered the house, he consents that the said property be sold, and the proceeds applied under the direction of this court, to the payment of his just debts, reserving the surplus to this defendant and his family, and submitting to such decree as the court may make in the premises. The general replication was entered, and directions given for issuing commissions to take testimony, and such commissions accordingly issued. On motion of the complainants' counsel leave was given to examine *John Rogers*, one of the defendants, saving all exceptions. The testimony taken was very voluminous; and related to the consideration in the deeds from *Rogers* to *Strike;* the declarations of *Rogers*, and of *Strike;* the value of the property; the amount of the rents and profits, and the manner in which the distress of *Rogers's* property for rent was conducted, &c.

*John Rogers*, (one of the defendants, but whose examination as a witness was excepted to by the defendant *Strike*,) deposed, that he was a partner in the house of *Henderson & Rogers* at the

time of their failure in 1811. That he executed the deeds to, *Strike*, to prevent the property therein mentioned being made liable to the debts of *Henderson*. That there was some of the property of *Henderson & Rogers*, seized for the private debts of *Henderson*, contracted before the co-partnership of *Henderson & Rogers*, by *Charles Gwinn* and others. That he did apply to *Alexander Irvine* and *Frederick Johnson* to suffer him to execute deeds to them for the same property, to prevent the property being seized for the debts of *Henderson & Rogers*; Mr. *Irvine* refused, and Mr. *Johnson* was in *Bucks* county, *(Pa.)* and not convenient. He did execute deeds to *Johnson*, but he did not come in time and never received them. That it was expressly understood between this deponent and *Strike*, that the deeds were executed to *Strike* for this deponent's own benefit, and that *Strike* acted as the deponent's friend, to protect the property for this deponent's use, from the debts of *Henderson*, contracted before the partnership of *Henderson & Rogers*. That there was no money paid by *Strike* to this deponent for said property until a considerable time after, say eleven months; the property was never sold to said *Strike* to be kept as his own property. That *Strike* did for some time after the execution of said deeds, loan occasionally sums of money to this deponent, but it was considered by this deponent, as lent money to be returned; but does not know how *Strike* considered it. That *Strike* did in presence of *Strike's* brother-in-law and wife, and one of his sons, promise to convey the property to this deponent in six months or six years, upon payment of the sums he *(Strike,)* alleged to be borrowed from him by this deponent; and this deponent did inform Mr. *Irvine* of the transactions. That he remained better than eighteen months in the house in which *Strike* now resides, after the date of said deeds; this deponent never paid *Strike* rent in his life. That this deponent was induced by *Strike* to suffer a distress to be laid on his furniture in *Strike's* name, that the same might be bought in for his *(Rogers's)* use, and prevent it being taken by his other creditors. That the said furniture was all bought by *P. Coulson*, for the deponent, except the candlesticks and carpet by *Wolfenden*, for this deponent's use; and all were sent to this deponent's house; this deponent did procure

*Coulson* to purchase them, by the advice of *Strike.* That *Strike* did advance the money to pay for said furniture; this deponent had not at that time five dollars in the world. That the said goods were immediately carried from said dwelling-house, when sold, to the house rented by this deponent in *Whiskey-alley*, after his removal from *Pratt-street.* That *Strike* advised him to remove to *Whiskey-alley* because the house was cheaper, and nearer his furnace and his business; and he thought it good advice at that time. That *Strike*, a considerable time after the date of said deeds, made out an account of the monies borrowed by deponent from *Strike* since the date of said deeds, including $500 for repairs of said house, and this deponent signed the same at his request, as an evidence that this deponent owed *Strike* that amount. That one of the charges in said account was $500 for repairs to the dwelling-house in *Pratt-street.* That this deponent received from *Falls & Brown*, two bonds of Dr. *Harsnip* and *Shipley*, in payment of a debt due to this deponent individually from said Dr. *Falls* for building a mill; and this deponent delivered said bonds to *Strike*, as his trustee, under the application for the act of insolvency. That *Strike* did return the two bonds of *Harsnip & Shipley* to this deponent, upon this deponent paying *Strike* the money he had paid to Colonel *Small.* That the debt due by this deponent to Colonel *Small*, was for lumber to repair the dwelling-house in *Pratt-street*, purchased before the date of said deeds to *Strike;* and said lumber was in the house, and at the furnace, when *Strike* went to reside at the house in *Pratt-street.* That the said bonds of *Harsnip & Shipley* were put into the hands of *J. Oakley* and *Wm. M'Donald*, this deponent's creditors, to satisfy them part of their debts, and also a debt due *Nixon Wilson.* That this deponent does not know the amount due *John Oakely.* That this deponent was interested one-third in the lease from *Strike* to *Coulson* and *M'Ardle*, and *Strike* knew this deponent was so interested. The house in *Whiskey-alley* was not leased with the furnace lot. That this deponent received the rents of the houses in *Whiskey-alley* for nearly two years after the date of the deeds to *Strike;* he never paid said rents to *Strike*, nor did *Strike*

ever ask deponent for them; *Strike* knew this deponent received said rents.

He was then examined upon cross interrogatories on behalf of the defendant *Strike*, and answers: That there were about 2000 bushels of wheat, and about 1100 barrels of flour, seized by *Charles Gwinn* and others, for the private debts of *Henderson;* this was in the year 1811. That the property was conveyed to *Strike* for the use of this deponent and wife, and this deponent's private creditors. That he does not know how much money he received from *Strike*, or when, but the paper which this deponent signed for *Strike* is correct, except the $500 for repairs. That the said money was received, a triflle before, and the remainder after this deponent's application for the benefit of the insolvent law; this deponent does not recollect how much money he received from *Strike*. It was about eighteen months after the date of the deeds to *Strike*, that *Strike* offered to reconvey said property to this deponent. That he never was to pay *Strike* any thing for rent of said house in *Pratt-street*. That *Strike* advanced to him 300 and some odd dollars, which was paid by this deponent to *Coulson,* and by *Coulson* to *Carroll* the constable; the sales of said furniture were upwards of $300; the furniture was all, except one candlestick, sent to this deponent's house in *Whiskey-alley;* said sale was made at his house in *Pratt-street;* the said furniture was seized by *Strike* under pretence of house rent due *Strike*, and to prevent other creditors from seizing it. *A. Carroll* levied said distress, and sold the property to the highest bidder at public auction; *Strike* was present a few minutes at the sale, and then gave this deponent the money which was paid to *Carroll*. He did receive back from *Strike* the bonds before mentioned, upon this defendant's paying *Strike* between fifty and sixty dollars, which *Strike* had paid Colonel *Small;* he thinks about $800 due when *Strike* returned him said bonds; this deponent called a meeting of his creditors at *Barney's* tavern, and gave said bonds, and his gold repeating watch, to *John Oakely, William M'Donald* and *Nixon Wilson;* he received no money on said bonds, after he received them from *Strike*, and before he gave them to *Oakely, M'Donald* and *Wilson*. That he never did put the bonds of *Harsnip* and

*Sutherland* in the hands of *Strike;* he thinks *Sutherland* was a surety on *Harsnip's*, but there were only two bonds which were the bonds of *Harsnip* and *Shipley.* That he pledged all his property to *M'Donald*, to help to carry on this law suit against *Strike,* and to be his friend; *M'Donald* promising to deliver back the property to this deponent after the suit was gained, and he *(M'Donald)* paid what money this deponent owes him; this deponent is to pay *M'Donald* whatever money he may advance on the law suit, and what this deponent owes *M'Donald*, if the property is recovered from *Strike;* that *M'Donald* is to be first paid, and the balance of property to be returned to this deponent. This deponent held 400 acres in *Virginia*, which was willed to this deponent by *F. Maguire*, and he verbally conveyed his right to said land to *M'Donald*, until this suit be over; this deponent corrects himself by saying the land was willed to his son, *John Rogers*, Junior; *M'Donald* had lent this deponent (he thinks,) about $400, but paid him no money on this land; this deponent verbally conveyed the said land in *Virginia* to *M'Donald* about four months ago; when this suit is ended this deponent is to receive back said land, and all his property, upon *M'Donald's* being satisfied. He mortgaged said land to *John Brady* for the purpose of finishing *L. Martin's* building, but returned said *Brady* his money, which money *M'Donald* gave this deponent to return to *Brady.* Said mortgage was executed before his verbal conveyance to *M'Donald.* He lent *F. Maguire* $700 on Thursday evening, he died the Saturday following, and his wife took her oath before the county and orphan's court, that he had no friend in *Baltimore* but this deponent; and for the money this deponent lent *Maguire*, he, by his dying words, gave his land on *Potomac* to *John Rogers*, Jun'r. this deponent's son; and *Priestman* and *Whalen* and the widow, executors, made a deed for said lands to *John Rogers*, Jr. He lent the money to *Maguire* he thinks about two and a half years ago. This deponent promised to put in *M'Donald's* hands the debts due this deponent from *F. Price, L. Martin* and *Hugh Neilson*, which debts were for work done since his application for said laws. This deponent never had a final discharge, but took a stay for his body. That he owes *F. John-*

*son* nothing, but thinks if their accounts were settled he would owe deponent something. They have never settled their accounts. This deponent was not a party in the lease from *Strike* to *Coulson* and *M'Ardle*; the lease was made to *Coulson*, *M'Ardle* and *John Rogers*, Jr. to prevent the creditors from getting at the property. That he told *Strike* he had received the rents for the houses in *Whiskey-alley.* That *Strike* lent him no money at or before the time of the execution of the deeds; the money was lent in the years 1814 or 1815 as deponent thinks. That he promised continually to return the property to deponent, but the time before mentioned by him, was the last. That *Strike* had lent him nothing at the time of the execution of the deeds, but he promised deponent frequently afterwards to return him his property, upon payment of what deponent owed him. That *Strike* did cut down the trees in *Whiskey-alley*, and one before the door in *Pratt-street;* deponent complained, and *Strike* promised to satisfy him for the injury, if any. That *M'Donald* frequently told deponent that his watch was safe enough; deponent thinks that *M'Donald* would return it if asked, but he was never asked for it. That his son *John* is between fourteen and fifteen years of age. That a few days ago, on the morning of his long examination, *Strike* took him to the tavern at the corner of *St. Paul's-lane* and *Chatham-street*, and treated him with liquor; he proposed to deponent to come before the commissioner and say that he, *Strike*, had lent the deponent $3500, and his, *Strike's*, house should never be shut against him, *Rogers*, and he would settle the balance with him at some other time. That it was the morning of his examination, and just before he delivered his testimony. That he certainly means the money which *M'Donald* gives to himself, or his attorneys, in carrying on the law suit, and for the support of his family. That the said sum of $700 was part of the profits of his furnace, and not lent him by *Strike.* He put in $1880 in the concern with *Coulson* and *M'Ardle*, in the furnace built upon one of the lots now in dispute; that this was in 1814 or 1815, as he thinks; that some of this money was lent by *Strike*, and some received from *Hugh Neilson, Ennion Williams* and *Frederick Price*, for work done for them, which was collected by him from the above persons in 1814 or 1815,

for work done by him before that time. That he thinks he became concerned in said furnace in the year 1814 or 1815, with *P. Coulson* and *M'Ardie;* that upon reference to the lease he finds he was mistaken, and that his concern in the furnace commenced in 1812; that he does not recollect what sum of money he employed in said furnace from time to time, that he only put $1880 in the same concern, altogether, as his whole capital; that the concern existed eighteen months or two years. That he rented the upper rooms of the house in *Pratt-street* to Mrs. *Ramsay,* after the conveyance to *Strike,* at five dollars per month; that he thinks Mrs. *Ramsay* resided about two years in the house; that he never rented any part of the house in *Pratt-street* to any body until after the conveyance to *Strike.* That his son, *John Rogers, jr.* resides in the city of *Baltimore,* and never was in *Virginia* to deponent's knowledge. That he did not apply to *Strike,* or press him, to consent to withdraw the present case out of court, and did not suppose, *Strike* would speak to him; that he told *Strike* he would soon have it settled by two honest men, as the law suit was expensive to him and his children, and kept him from his trade; that he never said his lawyers were trying to get the money into their hands, and that deponent would never get any part of it.

The defendant *Strike,* exhibited his lease to *Coulson* and *M'Ardle,* dated the 6th of October 1812, for a parcel of ground in *Baltimore,* for 10 years, at the annual rent of $80. Also a deed from *Susanna M'Guire, Jonathan Whelan* and *Thomas Priestman,* administrators of *Francis M'Guire,* to *John Rogers,* junior, dated the 8th of February 1816, for 388 acres of land in *Hampshire* county, in the state of *Virginia.* Also a deed of mortgage from *John Rogers,* junior, to *Samuel Blair* and *John Brady,* dated the 20th of March 1816, of the 388 acres of land, &c. Also a deed for the same land from *John Brady,* the trustee in the last mentioned deed, and who had sold the premises, &c. to *John Donaldson,* dated the 16th of September 1816. Also a deed from *John Donaldson* to *John Brady,* for the same land, dated the 28th of December 1816. Also a deed for the same land from *John Brady* to *William M'Donald,* one of the complainants, dated the 3d of October 1818, consideration $253. Also a deed of mortgage from *John Rogers*

to *William M'Donald*, dated the 26th of November 1817, to secure the payment of $700, with interest from the 1st of May 1819. This deed .was for 412 acres of land in *Hampshire* county, in the state of *Virginia*, and is stated to have been conveyed by *Whelan* and *Priestman*, administrators of *M'Guire*, and by *Susanna*, his widow, to the said *Rogers*. Also a deed of mortgage of the same land from *John Rogers*, to *William M'Donald*, dated the 24th of November 1817, to secure the payment of $300, with interest as aforesaid. Also a number of recepts given by Mrs. *Rogers* for rent of a part of the premises in dispute; and also receipts for ground rent, taxes, &c. paid by *Strike* from 1810 to 1818. Also a deed of assignment of a lease from *Robert Henderson* to *John Rogers*, dated the 30th of September 1809, of the lot, &c. on *Pratt-street*, in consideration of $1900. Also another deed of assignment of a lease from *Robert Henderson* to *John Rogers*, dated the 30th of September 1809, for another parcel of ground in *Baltimore* county, and near the city of *Baltimore*, beginning at the distance of 90 feet E from the N E corner of *Pratt* and *Paca-streets*, on the N side of *Pratt-street* continued, running E bounding on *Pratt-street* continued 33 feet, then N parallel with *Paca-street* to *Whiskey-alley*, &c. consideration $500.

*Strike*, one of the defendants, afterwards filed another answer stating that he believes *Rogers* petitioned for the benefit of the insolvent laws, and filed with his petition a schedule of his property, and a list of his creditors and debtors, but for greater certainty begs leave to refer to the same of record in this court. This defendant admits he was appointed trustee for the benefit of the creditors of *Rogers*, and that *Rogers*, in pursuance of the said insolvent laws, made and executed a deed to this defendant, which is also of record in this court. That this defendant at the instance of *Henry Rogers*, Esquire, attorney at law, instituted suit in *Baltimore* county court against *Penelope Price*, late widow of *Frederick Price*, one of the debtors of *Rogers*, the insolvent debtor aforesaid, and contained in his said schedule, the cause of action whereof had been before, as this defendant hath been informed, placed by *John Rogers* in the hands of the said *Henry Rogers* for collection. That *Greetham & Devereaux*, other debtors of *Rogers*, and mention-

ed in his schedule, were insolvent debtors, and evidently not solvent at the time of this defendant's appointment as trustee aforesaid. He hath no knowledge of any claims or debts due to *Rogers* than are contained in his said schedule, except as hereinafter mentioned, if such may or can be deemed belonging to *Rogers* at the time of said insolvency. That *Rogers,* before his application for the said insolvent laws, conveyed to the defendant, for the consideration mentioned in the deeds, the lots of ground therein mentioned; and this defendant denies that the said deeds were made to him by *Rogers,* in trust for *Rogers's* benefit, or to defraud *Rogers's* creditors; but this defendant saith, that he paid to *Rogers* the full consideration expressed in said deeds for said property. He admits that the complainants have filed their bill in equity in this court against this defendant and *Rogers,* and that a commission has issued to take evidence, and has not yet been returned; but he denies that the testimony taken under said commission does establish the fraud and want of consideration as set forth in the complainants' bill. He denies that he ever procured himself to be appointed trustee for *Rogers,* by fraudulent collusion, as set forth in the bill. He was appointed trustee without any solicitation on his part, and did not know of said appointment until it was made. That after he was so appointed trustee he was about to take the possession of the property mentioned in the schedule of *Rogers.* He found that the property being household furniture was claimed by the landlord of the said house, wherein the said furniture then was, to a larger amount than the said property was worth, and that the said claim of said landlord was for house rent in arrear. That long before *Rogers* applied for the benefit of the said insolvent laws, he placed in this defendant's hands, then a constable of *Baltimore* county, for collection, two bonds of a certain *Harsnip & Sutherland,* the amount whereof he cannot precisely recollect, but which he believes are now in the possession of *Wm. M'Donald,* or the same has been collected or recovered by him. That *Rogers* had created liens on the said two bonds then uncollected; so held by the defendant, one in favour of *William M'Mechen,* Esquire, for $120, the other in favour of *Jacob Small* for $80; and this defendant, long before his said appointment as trustee, received no

tice of said liens, and was directed to hold the said sums of money for the said *M'Mechen* and *Small*, by them, with *Rogers's* consent.    That after his said appointment as trustee he received a note in writing from *M'Mechen*, desiring him to deliver the said bonds to Mrs. *Rogers*, wife of *Rogers*, as he had taken *Rogers's* note for the debt due him from *Rogers;* and Mrs. *Rogers* having paid this defendant the sum of $80, the amount of *Small's* lien, he delivered up the said two bonds to Mrs. *Rogers*, under the impression and belief that he, as trustee, had no right to retain the said bonds, because they were not mentioned in the schedule filed by *Rogers* with his petition for the benefit of the said insolvent law, and were claimed as aforesaid.    That *Rogers*, having received the said two bonds last mentioned from his wife, as this defendant is informed and believes, deposited the same with a certain *Robert R. Richardson*, in pledge, or to have the same discounted.    That *Nixon Wilson*, a creditor of *Rogers*, issued an attachment against *Rogers* to affect the said bonds in the hands of *Richardson*.    That the said bonds were delivered to *Wilson* by *Richardson* with the consent of *Rogers*.    That *William M'Donald* afterwards applied to *Wilson* for said notes, which were delivered by *Wilson* to *M'Donald* who now holds the same.    That he never received any part of the said two bonds, nor hath he received any money or property of any description from the estate and effects of *Rogers* since his appointment as trustee aforesaid, or before his said appointment as trustee, belonging or which ever belonged to *Rogers's* creditors which he ought to account for under his trust.    He denies that he hath been guilty of any fraud or neglect as trustee of *Rogers*.    He denies that *Rogers* handed to him any evidences of debts due to him, or accounts due to him, or any other property, real, personal or mixed, than is mentioned in his said schedule, nor did this defendant receive an account or voucher for the debts due *Rogers* mentioned in his schedule.    He hath not received any of the debts due *Rogers*, mentioned in his schedule aforesaid.    He hath no knowledge of any claims or debts due *Rogers* more than are contained in his said schedule, except the two last mentioned bonds, and that in the manner herein before stated.    He hath heard and believes that *Rogers* was seized in fee simple of a tract of

land lying in *Virginia*, containing about 412 acres, which said land belonged or ought to belong to his, *Rogers's* creditors, as this defendant is informed, which said land *Rogers* hath caused to be conveyed to *William M'Donald*, by deed of bargain and sale, in payment of the complainants' claim, which they allege is now due from *Rogers* to them. A record of the discharge of *John Rogers* under the insolvent laws of *Maryland* was also exhibited.

DORSEY, Ch. J. of the sixth judicial district of *Baltimore* county court, (28th of May 1822, during March term 1822.) The said cause being ready for hearing, and having been fully argued by complainants and defendants, the bill, answers, exhibits, testimony, and all other proceedings, were by the court read and considered; and it being fully established to the satisfaction of the court that *the deeds of sixteenth of January*, 1811, from the defendant *Rogers* to the defendant *Strike*, *mentioned in the said proceedings*, were executed for the *purpose of defrauding the creditors of Rogers*, and without *bona fide* consideration.—*Decreed*, that the said deeds be, and they are hereby declared null and void, as against the complainants in this cause.—*Decreed* also, that the property in said deeds contained be sold. That *Henry W. Rogers* and *Samuel Moale* be, and they are hereby appointed trustees for the purpose of making said sale, &c. And the trustees shall bring into this court, the money, or securities for money, arising from said sale or sales, to be applied, under the court's direction, after deducting the costs of this suit, and such commission to the trustees as the court shall think proper to allow, in consideration of the skill, attention and fidelity, wherewith they shall appear to have discharged their trust. All equities as to the distribution of the proceeds of sale, are reserved by the court for hearing, on the trustees' report, on bringing into court the money or securities arising on the sale.

WARD, A. J. (31st of January 1825.) In this cause, upon motion of the complainants' solicitor, it is Ordered and decreed, that it be referred to the auditor of this court, to state an account of the sums appearing due in this cause from the defendants, or either of them, to the plaintiffs; and also to take an account from the

proofs in the cause, or such other proofs as may be required by him of the rents and profits of the several premises contained in the deeds of 16th January, 1811, from the defendant *Rogers* to the defendant *Strike;* and also of the taxes and necessary repairs paid on the same by him; and also such further account as he may be directed to take by the said plaintiffs or defendants, and submit the same by report to this court, reserving further consideration, &c.

The property was sold by the trustees, and the proceeds of sale brought into court. The lot on *Pratt-street* was sold to *William M'Donald,* one of the complainants, for $2600; the other lot was sold to *James Lyon* for $1350. The sales were ratified by the court. The auditor was directed to state the account of the trustees.

The following petition of the solicitors of the complainants was exhibited by the complainants. In this case the court has ordered that notice be given to the creditors of *Rogers,* to exhibit their claims in this court for settlement. The undersigned silicitors for complainants, beg leave to state, that by an agreement made with their clients on 18th September 1820, it was provided that they should receive as a compensation for their services, a commission of 20 *per cent.* on the sum recovered, deducting therefrom the sum of $50 to each of them, respectively, paid on that day. Under this agreement they have conducted the case to a decree, and the court will see by the voluminous record, not without great labour and difficulty in the preparation of the case, beside a very long and laborious argument, occupying more than a week of the exclusive attention of the court. By the report of the trustee, it appears that the amount of sales is $3950, on which, according to the above agreement, they are entitled to the commission of 20 *per cent.* but as the introduction of other creditors into the case, may lead to some difficulty, they pray the court to sanction this allowance by their order, directing the auditor to state this as one of the allowances to be made in the sale in the trustees account.

ARCHER, Ch. J. on the within petition, it is this 9th day of January 1824, Ordered and directed, that the auditor, in stating the account with the trustees, allow to *Henry W. Rogers* and

*Henry M. Murray,* solicitors for complainants, the sum of $690, as complete fees for conduct of the case, subject to the usual exceptions.

On the 6th of April 1824, the auditor made his report, stating that he has examined the proceedings in this cause, and from them has stated the claims against the late firm of *Henderson* and *Rogers,* and *John Rogers,* and also the within account between the estate of *John Rogers,* and the trustees; that from the papers in this cause, it appears that the complainants have received the sum of $549 10, the amount of two bonds due to *Rogers,* but that there is no evidence to show that they are entitled to retain the same to their exclusive benefit, except the amount of $476 13, a part thereof having been by them paid in discharge of a lien upon the said bonds, and the balance in securing the same. The auditor has therefore credited the estate with the whole sum thus received by them, with interest thereon, and has stated the sum then paid them as preferred claims, in order that they may account with the trustees for the difference in receiving their dividend. The auditor also reports, that in stating the said account, he has credited it with the proceeds of the sale; and that he has in the first instance applied the proceeds of the said estate to the allowance to the trustees, the costs in this court, the preferred claims of the complainants before mentioned, and the allowance of their solicitors, and that he has distributed the balance *pro rata,* amongst the creditors. The auditor also reports, that in stating the said claims and accounts, he has not noticed the claims of the defendant *Strike,* because the whole of them appear to have proceeded from, and to have grown out of the first fraud between *Strike* and *Rogers,* and are not therefore entitled either to a preference or dividend.

The complainants excepted to the report of the auditor, 1st. Because there is no evidence sufficient in law to support the various claims stated in said account, except the complainants' claim, filed or exhibited in the cause. 2d. Because the said claims, or the greater part of them, have been paid and satisfied—your exceptants particularly charge that the following claims, reported by the auditor, have been fully satisfied, viz. &c. and others which the exceptants will be prepared to prove as this court may direct. 3. Because the whole of said claims

are barred by the act of limitations, which your exceptants plead and rely on in bar of said claims. 4. Because from the laches and neglect of the several parties named in said account and report as creditors, to prosecute their several claims, they are not entitled to the aid of this court, or to come in for a proportion of said funds; and have not applied to be let in for such distribution. 5. Because said report and account are not in conformity with the evidence in the cause, or warranted by the principles of equity, and are in other respects erroneous.

The defendant, *Strike*, excepted to the report of the auditor—1. Because the auditor hath not stated the claim of the said *Strike* which is filed in the said cause, and the evidence which shows the veracity of the said claim sufficiently proved therein. 2. Because the auditor in his report hath mistaken both the law and the fact relating to the said claim of the defendant *Nicholas Strike*.

On the 17th of May 1825, the auditor made another report, in which he stated, that since the 13th February 1824, when he stated an account between the estate of *John Rogers* and *Henry W. Rogers* and *Samuel Moale*, Esq'rs. trustees of the said *John Rogers*, and made a statement of the claims against said *John Rogers*, (which said account and statement are filed in this court,) the complainants in this case have filed additional claims against said *Rogers*, which are herewith stated. And the auditor further reports, that the claims of *Hollingsworth & Worthington*, and *Irvine & Beatty*, contained in the aforegoing statement, have been withdrawn; and that, except the schedule of *John Rogers*, there is no proof to establish any of the claims contained therein, but the claims of the complainants and of *Robert Taylor*. That the claim of the said *Taylor* is for a judgment rendered against *Robert Henderson*, the former partner of *Rogers*, at October term 1812, of *Baltimore* county court, on a joint action with *Rogers*, which said judgment was revived against *Henderson* at March term 1821. The auditor further reports, that he has herewith made a statement of the rents received by *Strike*, and the sums expended in repairs done on the property in this cause mentioned, and in payment of taxes and ground rents thereon, so far as he could collect the same from the papers in the cause. And further, that although

he gave notice to the counsel of the complainants and defendants, to produce any further testimony which they might have, no additional testimony has been produced.

The defendant, *Strike*, excepted to the last mentioned report of the auditor—1st. For that the auditor hath not stated the entire claim of the said defendant, *Strike*, and that the said claim is not correctly stated from the evidence in the said cause.

2d. For that *Strike* claims the whole proceeds of the said sales of the said property mentioned in the said report, statement and proceedings, in preference to all the other claimants in the said cause, and will contend that he is so entitled.

3d. For that the said report and statement is erroneous and defective in point of law and fact; wherefore the said defendant, *Strike*, begs leave to except to the same, and that the said report and statement may not be confirmed by this court, but that the same may be remanded to the said auditor, or set aside and annulled.

The complainants excepted to the said report—1st. For that the auditor hath stated the claims of *Strike*, one of the defendants, for materials, work and repairs made upon the dwelling-house inhabited by him, which were done for his accommodation, and not to benefit the property.

2d. For that the said expenses and repairs were incurred by *Strike* under deeds which have been decreed by this court to have been obtained by *Strike* from *Rogers*, in fraud of the *bona fide* creditors of the firm of *Henderson & Rogers*, of which *Rogers* was a partner, and without consideration.

3d. For that the said auditor hath not charged *Strike* with the difference between the prices bid by *Strike* at a public sale of the said property by the trustees, and the subsequent sale of the same, he having refused to comply with his purchases.

4th. That the said auditor hath reported the claims of *Strike* for repairs done to said property, although *Strike* has refused to produce the bills of the persons who did the repairs, and has relied upon the conjectures of said persons as to their probable value after a long lapse of time.

5th. These complainants further except to the claim hitherto audited in the first report in favour of the *Mechanics Bank of Baltimore*, because the same is barred by the statute of li-

mitations, the said claimants having laid by, without making any demand, until these complainants, believing themselves the sole creditors, had, by their own exertions, and at their sole and great expense, succeeded in setting aside the deeds in this cause mentioned, when they have first presented their demand.

6th. For that the said report and statement is erroneous and defective in point of law and fact; wherefore the said complainants beg leave to except to the same, and pray that the report and statement may not be confirmed by this court, but that the same may be remanded to the said auditor, or set aside and annulled.

The cause and proceedings were afterwards transmitted to the court of chancery under the act of 1824, *ch.* 196.

The cause was then set down for argument, and was argued.

BLAND, Chancellor, (10th of April 1826 ) This case has been very elaborately argued, and is now presented to the court for the purpose of being finally closed. It appears to have been warmly contested in every stage. It has been partly decided, but there yet remains much to be judicially considered and determined.

There is no principle in relation to the administration of justice, which it is more important to preserve, or more necessary to adhere to than, that there must somewhere be an end to litigation. A matter which has been once solemnly decided, ought not, nor cannot be reheard and readjudicated; controversy must have an end, or society could have no peace. Errors of an inferior tribunal may be corrected by a superior; and even the same court, under certain circumstances, will correct its own mistakes by motion, petition, or bill of review. But no court of justice can allow itself to be engaged in the endless task of weaving and unweaving; of progressing to an adjudication, and then going back to readjudicate. Hence, whatever has been heretofore determined in this cause must now be considered as finally settled, and in every respect unalterable, except by bill of review, appeal, or in the regular course of law. This does not seem to have been directly controverted in the argument; but the counsel differ widely as to the nature of the decree of March, 1822—and as to how far it extends over the matter of

this suit; and some arguments have been urged which, if yielded to, might lead the court unwarily to trench upon the confines of that decree.

The first inquiry, therefore is, how much of this case yet remains to be judicially passed upon. This case was originated on the equity side of *Baltimore* county court, and has been removed into this court according to the act of assembly authorising such removals. It stands here now as it would have stood had it continued there, or as if it had been begun and instituted here, and these proceedings are to be so considered. They have not been affected by any mere circumstance of place or tribunal, but are here as if they had all passed under, and been sanctioned by the judicial authority of the present chancellor, and will be so treated accordingly.

The complainants come into court as the creditors of *Henderson & Rogers*, of both and each of them. These plaintiffs complain that their debt has not been paid; and they are here seeking payment. To enable this tribunal to give them the relief they ask; and which cannot be obtained without the aid of its peculiar powers; they point to certain property which they allege was once confessedly, and ought now in reality to be within their legal reach and subject to the payment of their claim. They allege, that this property which was at one time held by, and in the name of their debtor, *Rogers*, has been and is now iniquitously covered up and withdrawn from their grasp, by certain deeds of conveyance made by their debtor, *Rogers*, to a certain *Nicholas Strike;* they pray that this cover, and these impediments, may be removed; that the property may be sold; that the rents and profits of it may be accounted for; and that the proceeds may be applied in satisfaction of their claim. These plaintiffs then call on *Rogers* and *Strike*, as defendants, to meet and repel these allegations if they can.

*Rogers* appears, and admits that he is the debtor of the plaintiffs, and admits that he conveyed the property in question to *Strike*, but denies that it was done with any fraudulent design; on the contrary he avers, that those conveyances to *Strike* were made by him in trust for, and the better to secure the payment of all his just debts. *Strike* comes in and boldly takes his stand in direct and total opposition to the plain-

tiffs. He avers and undertakes to maintain and prove, that he acquired the property in question for a full and valuable consideration, and that he has a right to claim protection here, as a fair and *bona fide* purchaser. He plants himself upon the honesty of his title, and claims nothing by his answer which should not be conceded to a defendant who fully sustains such a defence as he has set forth.

In application to this claim and defence, proofs have been collected, and the case has been submitted to the decision of a competent tribunal, who in March 1822, declared and decreed, that the conveyances from *Rogers* to *Strike* were "null and void as against the complainants;" that the property in question should be sold; that the proceeds be brought in "to be applied under the court's direction," and concluding with a declaration, "that all equities as to the distribution of the proceeds of sale are reserved by the court for hearing," on their being brought in. *Jones v Slubey*, 5 *Harr. & Johns.* 383.

It is held to be a first principle, by every court of justice, that no one can ask for its determination without showing a sufficient ground for its decision. Before a plaintiff can call for a determination in his favour, he must furnish the court with a basis whereon to rest its judgment. In this case, the validity and sufficiency of the plaintiff's claim, are the very foundations of the decree; without that claim having been proved or admitted, no such decree ought or could have been rightfully made. It does, therefore, necessarily and conclusively establish the plaintiff's claim; and consequently, that claim cannot now, in this stage of this cause, be again in any manner put in controversy. This is the first point settled by this decree.

The decree then proceeds to remove obstructions, and to grant facilities. The deeds which were the impediments complained of, are declared to be null and void; or, in other words, as between the plaintiffs and defendants, they are totally annihilated. Whatever validity or operation they may be permitted to have, as between *Rogers* and *Strike*, they can have none at all "as against the complainants." In relation to them, this property is to be dealt with as if those deeds had never existed. This is the second point settled by this decree.

But it would have come to a most lame and impotent con-

clusion had it stopped here; therefore, after having determined that the plaintiffs had a claim, which ought to be satisfied, and that they had a right to have recourse to this property, it goes on to declare, that the property shall be sold, and the proceeds brought in to be paid over as the court should direct. And this is the third point settled by this decree. So far then the matters in controversy between these parties have been finally closed; and, this decree must be regarded, as all others of a similar nature have been, as a final decree; one in which all the material rights of the parties have been considered and adjudicated upon.

But the decree speaks of further directions, and of equities reserved; and it has omitted to say any thing of certain incidents to those rights which it had finally settled. As to all these particulars this decree yet remains to be fulfilled and executed. When a case circumstanced like this, is brought before the court, it is spoken of as a case for further directions; and this phrase is used in reference to all cases, where after the final decree, as in this instance, a further and eventual interposition of the court becomes necessary, to follow out and complete the equity, the substance of which has been established by the final decree. These further directions are spoken of in, this decree, and in all similar decrees of this court, and of the *English* court of chancery; but in giving them, the court must act consistently with itself; and in this instance, where the decree speaks of "the court's directions," and of all equities being reserved, its phraseology must be made compatible in all its parts. The reservation of all equities must not be used to fritter away, and to abnegate the substance of any matter, which had been in a previous part of the decree carefully and solemnly decided. No directions, therefore, will or can now be given, which are incompatible with the points settled by the decree. It is now brought before the court to be executed and completed, not in any manner to be revised or impaired. *The Santa Maria,* 10 *Wheat.* 442.

The decree of March 1822, is predicated upon the existence of a debt due to the plaintiffs; but it does not specify the exact amount, nor does it say any thing of the interest thereon. Interest in equity is held to be something more than a mere inci-

dent; it is the production, the fruit of the money due. In this case these creditors may now call for directions as to these particulars.    An exact estimate of their claim could not with propriety have been made until after the sale of the property decreed to be liable for its payment; because according to the course of the court in such cases as this, where the proceeds are insufficient to pay all, the interest is to be calculated only up to the day of sale.  This then is the first point left open by this decree; but it is a matter which is reducible to precision and certainty by the calculation of the auditor, to be made according to established principles, from the proofs in the cause; any further special directions in this instance, therefore, are deemed wholly unnecessary.

In this case, the bill expressly prays, that the defendants may be ordered to account for the rents and profits of the property in question. The decree has determined, that it was unlawfully detained, by declaring the deeds under which it was held, null and void.   It follows therefore, as a consequence of this decision, that an account of the rents and profits should now be ordered, and that directions should be given, as to the time for which the account is to be taken, and as to the manner of taking it.    This is the second point left open by this decree; and, as to which the chancellor will now give directions.

The decree totally annuls the deeds under which *Strike* claims, without retaining them as a security for any thing.  He can now therefore, claim nothing whatever under them as against the complainants.    But, if under all the circumstances of this case, apart from those deeds, and compatibly with the matters decided by the decree, he can show any equitable claim to an allowance for improvements he put upon the property in question, while it remained in his possession or under his control, the court may now give directions concerning such an allowance.    This is the third point left open by the decree, and upon which the chancellor will now decide.

This is one of those cases in which one creditor is allowed to file a bill for the purpose of subjecting the property of his debtor to the payment of his own claim; and of all others who may obtain permission to come in and participate in the burthens and the benefits.    The other creditors are allowed to come in

at any time, either before or after the decree; and it is most usual and proper that the decree itself should command the trustee to give notice, at the time of advertising the property for sale, to all creditors to bring in their claims with the vouchers. This is the fourth point which has been left open in this, as in all other decrees of the kind. The further directions as to claims which may be thus brought in, comprehends every thing concerning them. As to all matters of this nature, so far as may be deemed necessary in this case, the chancellor will now give directions.

It is said to be an established rule of the *Roman* law, and that of almost all modern nations, that the true proprietor shall not recover from the *bona fide* possessor, any rents and profits which have been consumed by him. But whatever fruits and profits, whether natural or industrial, such as trees standing or felled, grain growing, and the like, which remain upon the land at the time the true proprietor established his right, belong to him, and may be recovered from such possessor, as well as the land itself. Yet, as it would seem, if it can be ascertained, that the *bona fide* possessor was not merely maintained by the rents and profits, but was actually enriched by them, as by applying them to the payment of his debts, he will be held accountable to that amount to the rightful proprietor. But this general exemption is not granted to him, who, knowingly, keeps possession of another's estate, and therefore he is compellable to account for all the mesne profits he has derived from the land prior to its being recovered from him. *Prin. Eq.* 411, 420. *Just. Inst.* l. 2, tit. 1, *s.* 35.

According to the common law of *England*, the real owner may recover the rents and profits from the tenant, whether they remain upon the land or have been consumed by him or not; nor does the occupying tenant's knowing any thing of his adversary's title make any difference, as to the nature and extent of his liability for rents and profits. At common law no damages were recovered in any real action; because, as it was said, until the right to the land was determined, the party could not be said to suffer any wrong. But it seems to have been considered as well established law from a very remote period, that the right to maintain an action of trespass for the recovery of the

mesne profits, followed as a clear and necessary consequence of the party's having established his right to the land itself. And it appears to be somewhat singular, that during the period when real actions were much in use, the legislature should have deemed it necessary to interpose, for the purpose of allowing by positive provision, the demandant in many of them to recover damages or rents and profits, and yet that those real actions so amended and improved, should have been superseded by the action of ejectment, in which as it now seems to be settled, nothing is recovered but the land, and the party is left, as at common law, to recover the mesne profits in a separate action of trespass.    But the right to recover the mesne profits by way of damages in the modern action of ejectment itself, is recognized by an *English* statute passed in the year 1664, and the practice of so recovering. them, seems to have prevailed for some time in *England* and also in this state.    2 *Bac. Ab.* 437. *Lewis's Lessee v Beale*, 1 *Harr. & M'Hen.* 185. *Joan & M'Cubbin v Shield's Lessee*, 3 *Harr. & M'Hen.* 7.    *Gore's Lessee v Worthington, Ib.* 96.    *Stat.* 16, & 17, *Car.* II, *ch.* 8.

As early as the year 1667, in a case where lands were settled for the payment of debts, the trustees were held accountable in equity for the rents and profits to the creditors for whom they were received; and in 1685, it was held by the court of chancery, that he who took the mesne profits by wrong, was considered as trustee for, and accountable to him who had the right; and thenceforward the court of chancery made all persons account for the mesne profits they had received, to such persons as had the equitable title.    And it is now settled, that where there is a serious difficulty of recovering at law, fraud, concealment or the like, or where the title is merely equitable, the party may recover the rents and profits in equity.    But in chancery, as in the courts of common law, there seems to have been always a strong disposition to keep the adjudication upon the title entirely apart from the direction as to the mesne profits. It is not improper that the final decree, settling the right to the property, should also go on and decree an account for the rents and profits, but it is usual, where the property is sold, as in this case, to leave the account of the rents and profits to be provided for in the subsequent and further directions.    1 *Bac. Ab.* 34.

2 *Bac. Ab.* 263. *Spish v Foster,* 1 *Ves.* 89. *Dormer v Fortesque,* 3 *Atk.* 124. *Runn. Eject.* 444.

Where the party has no equitable ground of relief, and is under the necessity of proceeding at law, by an action of trespass for the recovery of the mesne profits, the tenant or defendant, by pleading the statute of limitations, may prevent the plaintiff from carrying his claim in all cases, as far back as the commencement of his title, and the wrong he has suffered. And should he proceed in equity, if there has been a mere adverse possession without fraud or concealment, the account will be taken only from the time of filing the bill, for it was his own fault not to have filed it sooner. But where the bill is brought upon an equitable title, and there is a trust; and in the case of an infant, or where there has been any fraud; and in cases of dower, an account of the rents and profits will be ordered, and that from the time the title accrued. *Pulteney v Warren,* 6 *Ves.* 89, 93. *Dormer v Fortesque,* 3 *Atk.* 124. *Goodtitle v Tombs,* 3 *Wils.* 121.

In an action of trespass for mesne profits, they are assessed at the discretion of the jury in damages, and therefore governed by no settled rule as to the amount. The jury may, if they think the circumstances of fraud and wrong warrant or require it, give large and vindictive damages, even as much as four times the value of the mesne profits; or, on the other hand, they may mitigate the damages down almost to nothing; and it does not appear that their unlimited discretion in this respect, has ever been materially controled by granting new trials. The court of chancery is more steady in its principles, with regard to the amount of the mesne profits. If the occupant is the mere rightful holder of the property as a pledge; for example, as mortgagee who has been let in possession, he is held accountable for no more than he has actually received, what has really come into his hands, and not for the full value, or what he might have made by skilful and proper management. But where the occupant is a wrongful holder, or has obtained possession, and has held it fraudulently, or where, there being several incumbrances, the first mortgagee uses his security for the purpose of shielding the debtor from the junior mortgagees; in such cases, such a fraudulent or wrongfully occupying tenant, or an incum-

brancer who makes such an ill use of his security, will be charged with the full value; that is, with such an amount of rents and profits as a skilful and diligent tenant might have made from the land.

In this case, *Strike* informs us in his answer, that he obtained possession of the property in question (the one lot actually, and the other legally, as the landlord of *Rogers*, on whose property he levied a distress for rent in arrear,) under and by virtue of the deeds from *Rogers* to him, on the date of them, and that he took and received the whole rents and profits. Those deeds have been declared null and void by the decree of March 1822, as against the complainants, on the ground of fraud. It appears, then, that *Strike* obtained possession of the property in question, fraudulently; that he used those deeds against these creditors, and that he wrongfully held the possession, and received the whole of the rents and profits from the date of those deeds; consequently, according to the principles of equity by which this court is governed, and I may venture to add, by the law of all civilized nations, in relation to the rents and profits, *Strike* must be charged with the full value of the property in question, from the date of the deeds down to the date of the sale when he was turned out of possession.

In relation to the improvements for which *Strike* claims an allowance, one would suppose, that in the administration of a system of jurisprudence in a civilized society, there would be no flux and reflux of the principles of justice; that a rule once found necessary could never drop into oblivion; that however it might be altered or reformed, it could never, for any length of time, be wholly forgotten, and then be called up again, and generally applied. But it would seem there is a fluctuation, perhaps indeed a mere change of fashion as to principles of law, as in every thing else. It does not appear from any thing I can learn, that the doctrine, in relation to an allowance to the occupying tenant for ameliorations, was ever at all, until very recently, presented to the consideration of a court of justice in this state as a subject of controversy, and perhaps never before so urged and investigated as it has been upon this occasion. *Drury v Watkins*, March 1823, (MS.) *Quynn v Haines*, 3 *Harr. & M'Hen.* 128. The principles of law, in relation to

this matter, belong to our code, but until lately, they have been suffered to lay unnoticed among those rarely used regulations, which are seldom examined but by the curious. In a neighbouring state, so far back as the year 1643, it seems to have been deemed expedient to place upon its statute book, all the rules in relation to compensation for improvement, made upon the land by one man, the title of which was in another. 1 *Hen. Virg. Stat.* 260, 349, 443. 2 *Hen. Virg. Stat.* 96. Yet upon a recent occasion, when a judicial decision was called for upon the occupying claimants law of *Kentucky*, involving matters which in a greater or less degree attracted the attention of the whole Union, it was found that those legislative provisions had disappeared from the revised statute book of that state, and it required some care to ascertain distinctly what was then its law upon the subject. *Green v Biddle*, 8 *Wheat.* 1, and *App.* n. 1.

It seems to be a sound and a very generally admitted principle of justice, that no man shall be allowed to enrich himself from the losses of another, or, as it is expressed in the *Roman* law, *nemo debit locupletari aliena jactura.* The moral force of this rule, in all cases to which it applies, and as between parties alike fair and innocent, appears to have been considered as altogether irresistible. In all cases in which the court is called on to apply this rule, it is essential that it should most clearly and distinctly appear, that he who claims an allowance for his losses in the shape of compensation, for improvements, should be entirely and absolutely free from all blame, because equity never interferes in favour of a wrong-doer. In cases where a *bona fide* possessor of property, one who is ignorant of all the facts and circumstances relating to his adversary's title, under a confident apprehension and belief that he was himself the true owner, proceeds to make improvements, and increase the value of the subject so held, it seems to have been almost universally admitted, that an allowance for such increased value should be made, at least to the extent of the rents and profits. According to the *Roman* law, such a claim for improvements may be extended to their full value, beyond the amount of the rents and profits as against the improved subject itself. *Dormer v Fortesque*, 3 *Atk.* 134. *Prin. Eq.* 103, 421. *Sugd.* 525. *Just. Inst.* l. 2, tit. 1, s. 29, and *notes.* And so, too,

according to the marine law, an account for meliorations is made, if necessary, even beyond the profits; and for ascertaining the amount, the rule is to consider the *quantum* of the improved state in which the ship comes into the hands of the original proprietors, for as to that part, it is not a restitution to them, but a new acquisition. 2 *Rob.* 239. 3 *Rob.* 101. 5 *Rob.* 294   But according to the *English* principles of equity, if the true owner insists on an account of rents and profits, as he may, not according to the value when the purchaser entered, but according to the present value, the court will order an allowance to be made for repairs and improvements.   *Sugd. 525.*

But where a man has acted fraudulently, and is conscious of a defect in his title, or has bought a title notoriously bad at the time of the purchase, in such a case as a *mala fide* possessor, he is permitted by no law to make any claim whatever for improvements; he must take the consequences of his own imprudence.   By the *Roman* law it is declared, that if a man build with his own materials upon the ground of another, the edifice becomes the property of him to whom the ground belongs, because the owner of the material is understood to have made a voluntary alienation of them, if he knew he was building upon another's land; and in the *English* court of admiralty, it has been held, that if a person buys a ship, the title to which is notoriously invalid, it must be at his own peril that he proceeds to lay out money in repairing and improving her, as no allowance for ameliorations will be made in such case. *Just. Inst.* l. 2, tit. 1, *s.* 30.   5 *Rob* 294.

In the argument of *Coulter's* case, 5 *Coke,* 30, among other things, it is said, "in divers cases, one who is in of his own wrong, shall recoupe and retain, &c.   He who hath a rent of £10 issuing out of certain lands, disseises the tenant of the land, in an assise brought by the disseisee, the disseisor shall recoupe the rent in the damages; so that where the mesne profits of the land in such case were of the value of £13, the disseisee shall recover but £3.   The disseisor shall recoupe all in damages which he hath expended in amending of the houses." And as an authority in support of the last position, a case is cited as far back as the year 1340.   This argument is adduced in a case in which the only question was, whether an executor *de son tort*

could retain. The court in their opinion held that he clearly could not, assigning the most satisfactory reasons; and they then go on to say, that "as to the case of recouper in damages in the case of rent-service, charge, or seck, it was resolved, that the reason of recouper in such case is, because otherwise when the disseisee re-enters, the arrearages of the rent service, charge, or seck, would be revived; and therefore to avoid circuity of action, and *circuitus est evitandus et boni judices est lites dirimere, ne lis ex lite oriatur,* the arrearages during the disseisin shall be recouped in damages; but if the disseisor ought to have common on the land, the value of the common shall not be recouped, for by the regress of the disseisee, he should not have any arrearages or recompence for them." *Green v Biddle,* 8 *Wheat.* 81. The court take no notice of the position advanced in the argument, that "the disseisor shall recoupe all in damages which he hath expended in amending of the houses," and assign a reason for allowing the recouper in the other instances put, that is utterly incompatible with allowing a disseisor or *mala fide* possessor, to recoupe what he had expended in mending the houses, and therefore the position cannot be admitted to be sound law, to the full extent for which it was advanced, if at all.

The term *recoupe* in the common law, signifies the keeping back or stopping something which is due, and is used for "to defalk or to discount;" of which *Coulter's* case furnishes an illustration. It is from the common law doctrine of recouper that our legislative provisions for "pleading discount," *Acts of Ass.* 1654, *ch.* 23, and 1785, *ch.* 46, *s.* 7, and the *English* statutes of set-off, about half a century later, have been derived. *Stat.* 5 *Anne, ch.* 17, *s.* 11. 2 *Geo.* II, *ch.* 22. *Just. Inst.* 1, 4, tit. 6, *s.* 30. They all rest upon precisely the same principles. The object is to prevent cross actions, or as the books express it, circuity of action, to allow the opposing claims of the same parties to be settled in one action, which must otherwise necessarily give rise to two actions; but however reasonable and desirable it may be thus to put an end to two subjects of litigation in one and the same suit, yet as it appears from *Coulter's* case no man shall be allowed to obtain this advantage by his own wrong; and therefore it is that an executor of his own wrong will not be allowed to recoupe and retain.

Apart from the doctrine of recouper, every claim must have a fair, legal, or equitable basis, whether presented to the court as the cause of an original action, or by way of recouper, discount or set-off. The claim for rents and profits, and the opposing claim for improvements, each of them rests upon principles of law and equity that are wholly separate and distinct. Whether or not the proprietor shall recover rents and profits must, in each case, depend upon the justice and equity with which he sustains his claim. If he has for an unreasonable time slept upon his rights, and there should appear to be any suspicious circumstances about his case, or any discoverable infirmity in it, the court will lessen or reject the claim altogether. So on the other hand, he who presents a claim for ameliorations, must in like manner show that it is sustainable on its own independent, substantial, and fair principles of equity; as it stands exhibited before the court, it must appear in all respects unsullied by wrong or deception; it must have no taint of fraud about it; if it has it cannot be allowed.

Such claims as these for rents and profits, and for ameliorations, may very often present themselves in a court of equity in opposition to each other; and be set up by litigating parties by way of recouper, discount or set-off, the one against the other. But if, as in the case of an executor *de son tort*, a man shall not be permitted to take advantage of his own wrong, even so far as to place himself in a situation to recoupe a just and equitable claim, most certainly the law would not endure a wrong doer to oppose a fair claim in any degree whatever, by one which had originated in, and was wholly founded in his own wrong. Hence it is that a *mala fide* possessor can in no ease, nor under any circumstances, be allowed any thing for improvements, either beyond or even to the amount of the rents and profits. A different rule, as has been justly observed, would place it in the power of the wrongful possessor to improve the right owner out of his estate. Yet it is said that where the sums are large, the peculiar circumstances of the case may influence the court in directing the account to be taken from the filing of the bill only, and not from the time of taking possession. *Sugd.* 526.

Now how stands the case under consideration in reference to this claim for improvements? The bill charges that *Rogers* conveyed the property in question to *Strike* for the purpose of avoiding the payment of *Rogers'* creditors; *Strike* answers and denies the charge, and avers that the conveyances to him were absolute, fair, and for a valuable consideration, and that he is the *bona fide* purchaser and holder of the property. But the court, by the decree of March 1822, has declared those conveyances to be null and void as against the complainants, and directed the property to be sold for their benefit. Hence it clearly appears, that *Strike* now stands before this court convicted and condemned as a fraudulent and *mala fide* purchaser and holder of the property. He, one of the very contrivers, and a party to the fraud, claims an allowance for improvements on the property so obtained and held. Such a claim, it is believed, was never sanctioned by a court of justice in any country, or at any time. According to all law, and every principle of equity, this claim for improvements of every description, must be totally and absolutely rejected.

*Strike's* claim for repairs and improvements have been thus disposed of on general principles. But it is alleged he has another and special foundation for his claim for amelioration, and advances, under the concluding sentence of the decree of March 1822. But that decree has declared the deeds from *Rogers* to *Strike* "null and void as against the complainants;" it has retained them as a security for nothing, and in no respect whatever. The several parts of that decree must be made to harmonize one with another. Those deeds which have been so totally annulled as against the complainants, cannot, therefore, consistently with that decree, be allowed to stand as mortgages against them, to secure to *Strike* either the amount of the improvements, or the advances in money he has made to *Rogers*. Upon that ground *Strike* cannot stand, because it is completely covered by the decree. This being the decided opinion of the chancellor, he might deem it unnecessary to notice that class of cases which speak of allowances for improvements and advances made by actual mortgagees, or by those *pseudo* purchasers of young heirs and others, whose conveyances are allowed by special favour to stand and be considered as of the na-

ture of mere mortgages. Yet from the manner in which those cases have been pressed forward, some further reasons, showing why they are inapplicable to this case, may be expected.

In this case it must be distinctly and constantly recollected, that *Strike* now claims reimbursement for his improvements and advances, not of *Rogers*, but out of the proceeds of the property in question, and against the creditors of *Rogers*, who are here as the complainants. All those cases of mortgages and *pseudo* purchases, are governed alike by the same principles of equity. A separate examination of each of them will therefore be entirely unnecessary.

In all, the bill is brought by the grantor against the grantee, or between parties who stand precisely in that relation to each other, to redeem the mortgaged property, or to set aside a conveyance which has been improperly or fraudulently obtained. And on the case being made out by the proofs, the tribunal has uniformly answered to him who asked the relief, "you must do equity before you shall obtain equity. It is true you have been imposed upon and defrauded—but it is no less true that you have been partially and in some degree benefited; you have received money from your opponent; he has permanently enhanced the value of your estate; refund the money you have received, pay for the increased value of your estate, and it shall be restored to you; the conveyances of which you complain shall be annulled, until then they shall stand as a security for those improvements and advances." Such is the language of the chancellor in those cases where he acts under the influence of the maxim, that he who asks equity must do equity; and this maxim is sanctioned and illustrated by an almost endless variety of cases to be found in the books.

But the application of this maxim in these cases, and for the most part, depends not only upon the immediate relationship between the parties of grantor and grantee, but also almost always upon the vendees being brought before the court by the vendor; that is, the contracting party injured as plaintiff, against the party injuring as defendant. A few examples will sufficiently illustrate this position: The plaintiff came to be relieved against the penalty of a bond; the ground of equity was established by the proofs, and the relief was decreed, but not with-

out the payment of principal and interest, even although it exceeded the penalty of the bond. *Fran. Max.* 4, *(note.)* 2 *Ev. Poth. Ob.* 89. But where lands were devised for the payment of debts, and there was a bond debt, the interest of which had outran the penalty, yet the creditor, on a bill filed by him, was allowed to recover no more than the penalty. In the first case the creditor was sustained by this maxim of equity—in the second, his case rested barely on his own contract. Again, the plaintiff for ninety pounds lent, fraudulently obtained a bond for eight hundred pounds, on which he obtained a judgment, and the object of the bill was to have certain lands subjected to the plaintiff's satisfaction in equity. But the court would not give him any relief, not so much as for the principal he had really lent, and dismissed his bill. If however the defendant in this case had come in to set aside the judgment for fraud, equity would have obliged him to pay the ninety pounds really lent. This case is also illustrative of another maxim, that he who has committed iniquity shall not have equity. *Fran. Max.* 8.

Now in order to bring these cases, and the principle they illustrate, fully to bear upon the case under consideration, it must appear, that the complainants not only claim under *Rogers*, but that they stand here in all respects as he would have stood; and that they ask to have these deeds vacated upon the same grounds that he could have made a similar prayer. But the case now before the court is of a totally different nature. *Rogers* himself is here as a defendant, charged as a *particeps fraudis*, and relief is prayed by these complainants against him as well as against *Strike*. The present creditors do certainly claim this property under *Rogers*; and it is also true that they can only take it, subject to all fair, legal and equitable liens with which *Rogers* may have incumbered it, antecedent and superior to their claims. But as against *Strike* these plaintiffs are to be considered as purchasers of the most favoured and meritorious class, holding by a prior and superior title. The improvements and the advances for the ground rent, the *Pratt-street* assessment, and the taxes alleged to have been made and paid by *Strike*, give him no lien upon the property itself against the rightful owner, either *Rogers*, these creditors, or any one

else. But if *Rogers* had come here to be relieved against the fraud practised on him by *Strike,* and to have the property restored to *him,* the court would have granted him relief only upon condition of his reimbursing *Strike* for all his improvements and advances, because they enured to the use and benefit of *Rogers.* But no equitable principle of that sort can be urged against the complainants. They are here as creditors, praying to be relieved against a fraud contrived between *Rogers* and *Strike.*

But admitting all this. It is alleged, that, independently of the vacated deeds and of the decree, *Strike* has a claim, as a kind of *salvor* of this property, which ought to be allowed. It is said he has saved it from the hands of the ground landlord, by paying the ground rent; he has saved it from the grasp of the *Pratt-street* commissioners, by paying the assessment levied upon it; and he has saved it from the power of the state, by paying the taxes. He maintains that he has a right to assume the place and to be substituted for those claimants, and he founds this claim upon the doctrine of *substitution.* But *Strike,* as regards these complainants, was an uninvited officious *mala fide* meddler with property which he knew did not belong to him, and which he was apprised ought to be liable to the claims of *Rogers'* creditors. He made these advances to serve himself, not for the benefit of these complainants; and if he had an intention that these advances should enure to the personal benefit of any one, it must have been to *Rogers;* because it was from him he took the estate; and if the conveyances were to be annulled it was only against him he could seek reimbursement. *Prin. Eq.* 134. *Strike,* therefore, cannot have, against these complainants, any shadow of countervailing equity on which to rest his claim for these advances, out of the proceeds directed to be brought into court.

Having discussed the liabilities and pretensions of the defendants, let us now consider the interests of the complainants among themselves. This is what is commonly called a creditor's bill; and where two or more creditors bring such a bill, or others come in afterwards, the adjustment of their rights and interests, in relation to each other, and the objections which the defendants may make against those who have come in after the

institution of the suit, most generally remain to be considered and decided when the court is called on to make a distribution of the fund. The claim of the plaintiffs has, as we have seen, to a certain extent, been settled and determined by the decree of March 1822—and therefore, their claim is not now to be re-considered and reinvestigated.

It has been objected that the bill does not, as it ought, allege that the complainants sue as well for the benefit of other credi-tors, as for themselves. It is often a matter of some perplexi-ty to determine who ought to be made parties, the rule being laid down in general terms, that all who are interested in the decree should be made parties. This decree virtually recog-nizes this as one of those cases in which all the other creditors of the debtor, against whom, or whose estate the suit is brought, may come in either before or after the decree, or at any time before the assets have been distributed, and claim a proportion-able share of them. And supposing the bill had alleged that the originally suing creditors sued as well for others as for them-selves, it is said that the right of such others to come in could not now have been questioned. In *England* it seems to be an established rule in cases of this kind, that the bill should dis-tinctly allege that the complainant institutes the suit, as well for the benefit of all others who may thereafter come in, as of himself. In this state such a *qui tam* allegation in bills of this nature is very common, and is certainly very proper and use-ful in apprising the court, and all concerned, at once of the ob-ject and character, in which the suit is brought. But this is the first instance here in which such an objection to a bill of this kind has ever been made, so far as I have been able to learn. In this case it sufficiently appears from the whole pro-ceedings, bill, answers, orders and decree, that this is a case in which other creditors may come in, and therefore in this in-stance, and in this stage of this case, I cannot say that this bill is erroneous and deficient for the want of such an allegation; and therefore in this case, the other creditors of *Rogers* may be permitted to come in and participate, notwithstanding there is no such allegation in this bill.

But it is objected, that those other creditors who, it is al-leged, have actually come in to partake, have not presented

themselves in legal and proper form, that their claims have not been sufficiently authenticated and proved, and, even if these objections were removed, that their claims are barred by the statute of limitations. These objections will be severally considered, and also the reply that such objections can only be made by the defendants, and not, as in this instance, by a creditor or co-plaintiff.

In *England* it is the established practice for the other creditors, who come in after the institution of the suit, to do so by bill or petition. In this state, the practice has been less formal and strict. In some cases the creditor, who wishes to come in, has filed his petition in the suit that has been instituted, concisely stating the nature of his claim, and praying to be admitted as a co-plaintiff accordingly. But in most cases the creditor has been allowed to come in and participate, merely by filing the voucher of his claim with the register. This latter mode certainly does, in many respects, save much trouble and expense, and is the preferable one, where the creditor's claim is of small amount. On adverting to the case of *Allen Quynn's* estate, I find, that I had there recognized it as the established practice of the court, in cases of creditors' bills. This practice will, therefore, be adhered to in future, in all such cases. *M'Mechen's Ex'rs. v Chase's Heirs,* 1820, *(MS.) Per Kilty,* Chan.

With regard to the proof of claims brought in by other creditors, it has been the practice in cases of deceased person's estates, to require no higher proof than such as would induce the orphans court to allow the claim according to the testamentary system, in case it were paid by the executor or administrator, and no objections were made. Because, in such cases, there being no other mode by which the real estate of a deceased person could be subjected to the payment of his debts, generally, including those due by simple contract, but by bill or petition in chancery; and on the creditors coming here for that purpose, it being directed to be sold, (as was usually expressly declared, in the older decrees of this court,) "for the payment of the just claims of the creditors of the deceased in a due course of administration," are therefore, when such assets are brought in, this court feels itself authorised and required to

act upon the same kind of proof that the orphans court acts on, in case of personal assets, and to make distribution upon the same degree of authenticity and proof; so that the creditor when his claim is submitted to a court of justice, will find the same measure in one tribunal as in another, or whether he obtained payment from one fund or another; and I find this practice spoken of as far back as the year 1803, as then well established. *Sluby's* Estate, *(MS.)*. *Fladong v Winter*, 19 *Ves.* 196. *Thompson v Brown*, 4 *Johns. Ch. Rep.* 636.

In cases of insolvency, under the acts of assembly which formerly referred such matters to the chancellor, it was the practice to consider the insolvent's schedule, or his voluntary admission, as sufficient evidence of the debt; or if the insolvent was dead then such proof as was admitted to sustain claims against deceased persons' estates. But, if the insolvent denied the debt, or there was any discrepancy between his schedule or admission and the creditor's claim, then the creditor was put to full proof. 1 *Ev. Poth. Ob.* 409 But the statute of limitations was never considered as an objection to the payment of a claim, either in the case of a deceased person's estate, or in the case of insolvency, unless it was specially relied upon. The case now under consideration is substantially and in truth, a case of insolvency; not, indeed, referred to the chancellor by any special act of assembly, but one which has been brought here by these proceedings, and in due course of law, and, therefore, the assets now here will be distributed upon such principles and proof as have been applied and required in similar cases, where no objection to the claim has been made.

But, in this case, the originally suing creditors have objected, that the claims of the other creditors who have come in since the institution of the suit, are not sufficiently sustained by proof; they have also objected that those claims are barred by the statute of limitations; and their reliance on the statute of limitations, it appears, was made, and sent with the reference of the cause to the auditor. The reply to these objections, in argument, is, that they are such as can only be made by one or other, or both of the defendants; and not by a creditor or co-plaintiff.

The debtor or his heir, has so manifest an interest in the real estate which it is proposed, in cases of this sort, to subject to the payment of his debts, that there never seems to have been any difference of opinion as to his right to make such objections. Where an executor or administrator fails to make such objections or waives them; or there has been a judgment against him; still the heir or devisee may make such objections in defence of the real assets. And where the executor and some of the heirs waives these objections; yet, any other of the heirs or devisees may alone make them in defence of the whole of the real assets, as was done in the case of *Wm. Frazier's* estate in this court. It seems to be conceded on all hands, that these originally suing creditors have an interest in these real assets; but, yet it is urged, that they cannot make such objections as these against the claims of their fellow creditors. This matter must be determined on practice, on principle, and on authority.

The defendants or the representatives of deceased debtors are generally from strong motives of interest, so very active in their opposition to all and each of the creditors, where opposition of any sort can be of any avail, that they rarely leave any thing to be said or done by any one else; and, hence, it would seem from the practice of the court, that they alone were the only persons who had any right to urge such objections. It is obvious, therefore, that the main current of the practice here is not likely to be very fruitful of information on this subject.

There is a class of creditors' bills common in *England,* but of rare occurrence here, which will cast light upon this matter. Bills are often brought there by one creditor in behalf of himself and others against executors to obtain payment, and to have the assets brought in and administered under the directions of the court of chancery. In such cases the executor is not bound to plead the statute of limitations; and if he does *not,* the creditors will have a decree, and be paid. But it is the constant course, in the master's office, to take the objections against other creditors, and to exclude from distribution, those, who, if legal objections are brought forward, cannot make their claims effectual. So, too, in cases of bankruptcy—if the bankrupt waives any objection, it may still be made by the cre-

ditors; and the reason of this is, that the creditors have a direct and manifest interest in the funds, and that it should satisfy their whole claims respectively. If each of them was not permitted to make these objections, they would be left at the mercy of those, for a full defence, who, in all cases, where the fund is not more than enough to pay all the debts, have no interest to exclude any one from partaking, to their prejudice, in the distribution, however ill-founded his claim may be. And besides, such bills by creditors, and proceedings in chancery, are only to be considered as other modes of compelling payment; and the chancellor is understood, in the distribution, to govern himself as to legal debts by the rules of law; and as to equitable debts, by the rules of equity, regarding the claim of each creditor as a suit depending; and, hence, if the executor or bankrupt fails to object or to plead the statute of limitations, it may be made or relied upon by any of the creditors; and the validity of such objections will sometimes be directed to be tried in an issue at law. *Exparte Dewdney*, 15 *Ves.* 497. *Civil Code Nap. Art.* 2225. *Giffard v Hort*, 1 *Sch. & Lef.* 409.

In this state, similar principles have been held and sanctioned in the case of *William Sluby's* estate:—In that case, Chancellor *Hanson* observes, in speaking of the liability of the real estates of deceased persons to be sold for the payment of their debts, under the act of 1785, *ch.* 72, that "no mode is prescribed by the act for establishing the debts. It is left entirely to the chancellor's discretion. But, (he observes,) it is a rule to admit claims on such proof as is prescribed for, and is satisfactory to an orphans' court; and even to admit claims passed against an executor or administrator by an orphans' court, unless objected to by some person interested, viz. *by a creditor of the deceased*, or his executor or administrator; or by the guardian of the infant." The chancellor then goes on to speak of the manner in which such objections should be tried; and in substance declares, that he would not direct an issue at law for that purpose, but in extraordinary cases. *Purnell v Comegys*, 1806, *per Kilty*, Chan. *(MS.)* *Edmonson, et al. v Frazier*, 1822, *per Johnson*, Chan. (MS.) There can be no difference, in point of equity,

between the case of a creditor's bill against a deceased person's estate, and a creditor's bill, as in this instance, against an insolvent's estate.   Therefore, upon principle and authority it is competent for these originally suing creditors to make these objections, and to rely upon the statute of limitations, in opposition to these claims of the other creditors who have come in since the institution of this suit.   But in applying the statute of limitations in such cases, it must be with all its saving provisoes; and also subject to the resuscitating qualifications of such acknowledgments as are deemed sufficient to take a case out of the statute; of which a statement in an insolvent's schedule may be considered as one, where the claim and schedule agree. And the statute, as in other cases, must be allowed to commence its operation from the time the debt accrued; and to run on until the creditor came in, by filing his petition, or the voucher of his claim.

The plaintiffs, by their bill found their claim, against the defendants, upon contracts made with *Henderson & Rogers*; and the decree of March, 1822, recognizes and affirms their claims of that description; and the proofs derived from competent witnesses, will enable the auditor, in fulfilment of that decree, to refer to the notes and vouchers, to ascertain the amount, and to compute the interest thereon.   But it would be altogether without precedent to allow a plaintiff to add to the amount, and to eke out his claim indefinitely, by introducing other particulars and causes of action of a different description, not mentioned or alluded to in the pleadings, or sanctioned by the decree, and which were only noticed in the depositions of some of the witnesses; or to bring in any additional claim by a mere *ex parte* petition, filed after the hearing and decree.

If the plaintiffs had other claims than those mentioned in the pleadings, subsisting at time of filing their bill, which might have been included therein, they should have had their bill so amended as to have embraced them, and thereby enabled the opposite party to gainsay them if he could:—Therefore the account of the plaintiffs, with *John Rogers* alone, and also their claim for costs in the suit against *Penelope D. Price*, must both of them be rejected.

The claim of the solicitors, *Murray* and *Rogers*, which ap-

pears to have been partially sanctioned by the order of the 9th of January 1824, may be considered as somewhat in the nature of costs; and it having been placed by the auditor's report before the party's other counsel, and all concerned, and no objection having been made, it would seem now to be proper to allow it entire; and it may be so stated by the auditor.

There is no evidence derivable from any competent source going to show that the complainants ever received the money said to be due on the bonds of a Doctor *Harsnip*, which were said to have been in their hands and others:—Any discount or deduction from the claim of the complainants on that account, must therefore be rejected by the auditor.

According to the established usage and practice of the court, as has been explained, there are but two modes by which other creditors can be permitted to come in and participate, in cases of this sort; they are either by petition, or by filing the vouchers of their claims. But the filing of the schedule of an insolvent debtor, certainly cannot by any strained or liberal construction of this practice, be considered as the filing of the vouchers of the claims, of all, or any of those creditors, whose names and claims are stated thereon; and laying aside the insolvent's schedule in this case, as furnishing no evidence of the intention of any creditor therein named, to come in and make a claim for any debt, which he alleged, and was ready to prove was due him, when such schedule was filed, three are but two other creditors who have made any show of coming in as other creditors of *Rogers;* and they are *Robert Taylor,* and the firm of *Hollingsworth & Worthington.* *Taylor* has filed a mere short copy of a judgment, which he obtained in *Baltimore* county court against *Henderson,* the partner of *Rogers;* and *Hollingsworth & Worthington* merely say, that the only demand they now have against *Rogers,* is for twenty dollars, lent him several years ago:—But these claims are so utterly destitute of any support by proof of any sort, that they must be rejected There are then, in fact, no claims of any other creditors of the defendant *Rogers,* which the auditor can be allowed to state and report for confirmation.

Upon the principles before explained, *Strike* must be charged with the rents and profits, or full value of the property in

question, from the date of the deeds from *Rogers* to him, to the day of the sale by the trustee.    The amount, or what has been the full value during that time must be collected and ascertained by the auditor from the proofs in the cause; and, for the reasons already given, *Strike's* claim for repairs, improvements and advances must be totally rejected.

The practice in this state is wholly unlike that of *England,* in relation to exceptions to witnesses. 2 *Madd. Ch.* 425. Here when the commission is returned, it is opened by the chancellor or the register, and objections of every kind to the testimony, are taken and considered at the hearing of the cause. In this case objections have been made to the reading of the depositions of two of the witnesses, on the ground of their being interested.    The proofs are all now to be sent to the auditor, upon which he is to found some of the particulars of the account he is directed to state.    But he should not be suffered to make any statements derived from the testimony of incompetent witnesses or illegal evidence.    Therefore these objections do not come now too late, and must be decided on for the government of the auditor.

The chancellor considers it as sufficiently apparent upon the proceedings, without going into a statement of the case, and his reasons, that *John Rogers,* the defendant, is an interested witness, and therefore the whole of his testimony must be set aside and totally rejected.    The reading of the deposition of *Alexander Irvine,* has also been objected to, on the ground of his interest.    It does not however sufficiently appear, that he was a creditor of *Rogers* and interested at the time; and therefore the objection against his testimony must be over-ruled.    A paper purporting to be the answer of *Strike* to a petition of the complainants filed in *Baltimore* county court against him, has been insisted on as applicable and furnishing evidence pertinent to this case.    But from its phraseology and general tenor, it is evident, that it cannot be a part of the pleadings of this suit, and without the other proceedings to which it purports to be an answer, it cannot be evidence in this cause, and must be rejected.

With these explanations, determinations and directions, the case is referred to the auditor to state an account accordingly;

and the several exceptions, as well of the plaintiffs as of the de-
fendants, to the auditor's statements and reports heretofore made,
so far as the same are inconsistent with the determinations and
directions herein before given, are overruled, and so far as they
may agree therewith, are sustained.

The complainants afterwards filed a petition stating that they
originally employed as their counsel in this cause *Henry M.
Murray* and *Henry W. Rogers*, Esq'rs. and agreed with them,
in case of successful termination of this cause, by a final de-
cree against *Strike* in this court, to pay them ten *per cent.*
each, on the amount of the proceeds of the said suit, as a com-
pensation for their services therein, subject to a deduction of
whatever moneys should be paid to them by the petitioners
in the meantime, on the account of this suit; and that after the
interlocutory decree was obtained, said *Murray* and *Rogers*
applied to *Baltimore* county court to fix and allow their per
centage, on the amount then received by the sale of the pro-
perty in dispute, under the said decree, made by the said court
while this suit was pending there, notwithstanding the interven-
tion of any other creditors, which was allowed by the said
court under the impression, as the petitioners believed, both of
the said court and the said solicitors, that those gentlemen were
to proceed in the said cause to a final decree as aforesaid, upon
which condition alone the petitioners alleged, was the said per
centage to be allowed by the agreement aforesaid. The petiti-
oners further stated, that the said *Henry M. Murray*, Esq'r.
soon after the order aforesaid was passed, died without pro-
ceeding further in the said cause, after the auditor's first re-
port therein, and the petitioners have been compelled to en-
gage *Charles Mitchell* as their counsel, in the place of the
said *Henry M. Murray*, who has attended to the same since
before the auditor and in *Baltimore* county court, and in
this honourable court; and the petitioners had alone borne all
the expenses of the said suit, on the part of the complainants.
Wherefore the petitioners prayed, that the same per centage in
proportion to his services in this cause, may be allowed out of
the said suit to the said *Charles Mitchell*, as was to be allowed
to the said *Henry M. Murray*, Esq'r. if he had lived to com-

plete the same as aforesaid, to be fixed and ascertained by this court, with reference to the services of the said *Charles Mitchell,* Esq'r. subject to a like deduction therefrom, of the money advanced by the complainants to him during the progress of this suit, or that this court would be pleased to prevent by any other or further order, which to this court may seem proper, any further individual burthen of the counsel fees in this cause upon the petitioners, but that the said fund may contribute thereto, as may be reasonable and proper under the agreement aforesaid, with the said *Murray, Rogers* and *Mitchell,* notwithstanding the intervention of any other creditors.

BLAND, Chancellor, (17th of April 1826.) The chancellor has read and considered the foregoing petition. No objection was intimated to him against the claim of *Henry M. Murray* until after the argument, and the chancellor was engaged in deliberating upon and maturing those directions with which this case has been lately sent to the auditor. The chancellor knows of no practice of this court, or of any analogous proceedings of the *English* court, which would authorise the introduction of claims of this sort into a cause, depending or about to be finally disposed of. The claim of the solicitors *Rogers* and *Murray,* he sanctioned under all the very peculiar circumstances which belonged to it, and he considers the objections to it stated in the foregoing petition as coming now too late. The claim has been acquiesced in, and could not now be reconsidered without giving *H. M. Murray's* representatives an opportunity of being heard, which cannot now be done. The chancellor must in all cases leave the contracts between solicitors and suitors, relative to professional services, to be settled and decided upon in like manner as all other contracts. They cannot nor ought not to be introduced into, and blended with any pending suit. Therefore this petition must be and is hereby dismissed with costs.

The auditor of the court of chancery afterwards, on the 4th of May 1826, made his report, in which he stated that he had restated the account between the estate of *John Rogers* and the trustees, applying therein the proceeds of sale, to the payment of the trustees commission and expenses; the complainants' costs in *Baltimore* county court, costs of this audit, and

the fees allowed to *H. W. Rogers* and *H. M. Murray*, Esq's. and the balance of the said proceeds then remaining to the payment of part of the complainants' claim allowed. By this account, the complainants' claim, exclusive of the allowance to their solictors, amount to $8657 81
Proceeds of sale applicable to the payment thereof 2750 80

Leaving a balance due the complainants of $5907 01 as of the day of the trustees sale. He has also stated an account between *Strike* and the estate of *John Rogers*, in which he has charged *Strike* with the full value of the rents and profits of the property conveyed to him by *Rogers*, rejecting entirely *Strike's* claim for advances in payments of taxes, ground rents, &c. and has also charged him with interest thereon up to the day of the trustees' sale. This account makes *Strike* indebted in the sum of $4967 68 from the day of sale; an amount more than sufficient to discharge the balance of the complainants' claims unprovided for by the former account.

To this report the defendant, *Strike*, excepted,

1st. For, that the auditor has rejected entirely the claim of the defendant *Strike*.

2d. Because *Strike* claims the whole proceeds of the said sales of the said property, mentioned in the trustees' report, statement and proceedings, in preference to all the other claims in the said cause; and will contend that he is so entitled.

3d. Because the auditor has charged the defendant *Strike* with the full value of the rents and profits of the property conveyed to him by *Rogers*, rejecting entirely *Strike's* claim; and because the said rents are charged higher than is warranted in the proof of the cause.

4th. Because the auditor should have allowed the defendant *Strike*, his advances in payment of taxes, ground rent, and the sum assessed for the extension of *Pratt-street;* which he has not done.

5th. Because the auditor should have allowed the defendant *Strike*, for all permanent and necessary improvements, laid out and expended, and created on said lots; which he has not done.

6th. Because the auditor has charged the defendant *Strike*, with interest on the rent and profits of said property to the day

of the trustees' sale, which makes *Strike* indebted in the sum of $6559.33, with further interest on $4967.63, from the day of sale; which he ought not to have done.

7th. Because *Strike* is charged with the ground rent upon the lot on *Pratt-street*, running to *Whiskey-alley;* which he ought not to have been.

8th. Because in the said account and report, an allowance is made to *H. W. Rogers* and *Henry M. Murray*, Esq. for fees; and also contains an allowance for expenses incurred by creditors at the private meetings, to consult about their private affairs.

9th. Because the said statement of account and report is erroneous in point of fact and law, and contrary to equity and right.

BLAND, Chancellor, (May 15, 1826.) "This case having been submitted upon the auditor's report, and the exceptions of *Nicholas Strike* thereto, without argument, the proceedings were read and considered. Wherefore, it is ordered, that the said exceptions to the said report, made and filed by the auditor on the 4th instant, are hereby overruled; that the said report and statements of the auditor, be, and they are hereby ratified and confirmed; and that the trustees apply the proceeds accordingly, with the interest that has been or may be received. And it is further ordered, that *Strike*, one of the said defendants, forthwith pay unto the complainants, the sum of $5907 01, together with interest thereon from the fourteenth day of September, in the year 1822, until paid. And it is further ordered, that the defendant, *Strike*, pay unto the complainants, all costs which have not been stated and included in the said report of the auditor, to be taxed by the register."

From which said order, and also from the order of the chancellor passed in the said cause on the 10th day of April 1826, and also from the aforesaid decree, of the said county court, in the premises, the defendant, *Strike*, appealed to this court.

The cause was argued at June term 1827, before BUCHANAN, Ch. J. and EARLE, and MARTIN, J.

*Winchester*, for the Appellant, contended 1. That the complainants being merely *simple contract* creditors of *Hender-*

*son* and *Rogers*, could not file their bill in equity to set aside the deeds from *Rogers* to *Strike*, without having previously obtained a judgment at law. 2. That the deeds from *Rogers* to *Strike* were absolute, *bona fide*, and for a valuable consideration. 3. That if they are not to be considered as absolute, they are to stand as security to *Strike*, and he is entitled to be refunded, 1st. The amount advanced by him to *Rogers*, which is proved to be $2200, with interest. 2d. For permanent improvements on the property. 3d. For contribution paid by *Strike* for the opening of *Pratt-street*—levied on the property in question under the authority of an act of the legislature of the state. 4th. For taxes and ground rents paid by *Strike*.

1. The complainants could not file their bill to set aside the deeds from *Rogers* to *Strike;* and whether they have relief against the property so conveyed, or whether the relief which has been granted to them ought to have been decreed, are questions for the consideration of this court. The claim of the complainants rests on the promissory notes of *Henderson* and *Rogers*—a simple contract debt. They show a debt due by *Henderson* and *Rogers*—that *Henderson* is liable equally with *Rogers*, and should have been made a party in this case. The complainants could not go against the individual property of *Rogers* until it was shown that the partnership funds of *Henderson* and *Rogers* were insufficient. The individual creditors of *Rogers* have a right to be paid out of the individual fund of *Rogers*, in preference to the creditors of *Henderson* and *Rogers*. The complainants are the creditors of *Henderson* and *Rogers*, and cannot be paid out of the private property of *Rogers*, until all his private creditors are satisfied their claims. A simple contract creditor cannot proceed in equity against the specific property of his debtor, until he has first resorted to a court of law to recover his claim. *Colman v Croker*, 1 *Ves. jr.* 160, 161. *Hendricks v Robinson*, 2 *Johns. Ch. Rep.* 283. *Bennet v Musgrove*, 2 *Ves.* 52. This is is not a creditor's bill, and cannot be sustained for the benefit of the complainants and other creditors. It does not profess to be for the benefit of other creditors. It has neither the form nor substance of such a bill. *Brinkerhoff v Brown*, 4 *Johns. Ch. Rep.* 671. *Williams v Brown*, *Ib.* 482. *M'Dermutt v Strong*, *Ib.* 687.

What effect will the decree of *Baltimore* county court have upon the question? Is it conclusive that the complainants had a right to sustain their bill, and the defendant precluded from an appeal from that decree? It is not final, but only interlocutory. It says that the property shall be sold, and the proceeds brought into court. There is nothing concluded by the decree; if any thing is, it is that the deeds were not absolute. The defendant had a right to appeal from the decree, if he had thought proper to do so; but he might waive that right until a final decree was passed. This he has done by the present appeal, and this court can take notice of and correct the first, and all errors committed by the courts below. *Hughes's Lessee v Howard*, 3 *Harr. & Johns.* 9.

2. The deeds are *bona fide*, and for a legal and valuable consideration. The bill does not profess to have the deeds set aside on account of fraud. There is no charge of fraud averred in the bill—it must be charged to give chancery jurisdiction. It is charged in the bill that the deeds were executed to shield the private property of *Rogers* from the payment of his debts, and the debts of *Henderson* and *Rogers*. *Rogers* had a right, at common law, to convey his property to any of his creditors. Our insolvent laws do not avoid such deeds. They were executed more than twenty months before *Rogers* applied for the benefit of the insolvent laws. There is no fraud charged in the bill, nor is any fraud proved in the case. The witnesses differ very materially as to the value of the property. The court can draw their own inference as to the value, without relying on the testimony of the witnesses. From their testimony no conclusion is to be drawn unless an average is taken of the value deposed to by the witnesses, and this would bring the value to very near the price that *Strike* paid for the property.

3. If the deeds are not to stand as valid, yet they must be as a security for *Strike's* claim, and he is to participate in the distribution of the fund produced from a sale of the property. He should be paid all money advanced by him to *Rogers*, and for all money expended for repairs, improvements, &c. paid for taxes, ground rents, &c. *Pow. on Cont.* 143, 145. *Francis's Maxims in Eq.* 1 *Max.* 1; 4. *Bill v Price*, 1 *Vern.* 467. *Zouch v Swaine,* *Ib.* 320. *Saunders v Glass*, 2 *Atk.* 296.

*Clarkson v. Hanway,* 2 *P. Wms.* 203. *Barker v Vansom-mer,* 1 *Bro. Ch. Rep.* 149. *Earl of Ardglasse v Muschamp,* 1 *Vern* 237. *Hawes v Wyatt,* 3 *Bro. Ch. Rep.* 156. *Attorney General v Vigor,* 8 *Ves.* 283. *Watt v Grove,* 2 *Sch. & Lef.* 492. *Carem v Johnston, Ib.* 283. *Sands v Codwise,* 4 *Johns. Rep.* 536, 578. 1 *Ball & Beatty,* 436. *Purcell v M'Namara,* 14 *Ves.* 91.

*H. W. Rogers,* for the Appellees—1. The defendant, *Rogers,* with a view to appropriate his property for the benefit of himself and family, and to shield it from his creditors, executed the deeds to *Strike,* purporting to be absolute. A fictitious distress is got up; by which, and the deeds, the whole property of *Rogers* came into the possession of *Strike,* who not only acted dishonestly with regard to the creditors of *Rogers,* but also as to *Rogers* himself, and determined, by making small advances to *Rogers,* to defraud him.

2. Can this court travel into the decree of *Baltimore* county court, and look into the merits or demerits of that decree? By the act of 1807, *ch.* 151, no appeal in any case is allowed after three years have elapsed between the judgment or decree and the time of entering the appeal. The question then is, was it a decree or not which was passed in this case by *Baltimore* county court? Whether the decree was final, or only interlocutory, still the appeal should have been within three years. *Thompson v M'Kim,* 6 *Harr. & Johns.* 302. The decree was final as to the question of right between the parties. The deeds were declared null and void, and were set aside. It is now attempted by this appeal to open that decree, having been passed more than three years before the appeal, for the purpose of letting in a technical objection—that the complainants had not proceeded at law to recover their claim, before they resorted to a court of equity. Captious objections will not be allowed. *Carroll v Norwood,* 4 *Harr. & M'Hen.* 290. The defendant should have demurred to the bill, and the complainants would then have dismissed their bill, and proceeded at law. But if the decree of *Baltimore* county court is open for the consideration of this court, yet it is impossible, from the testimony, for this court to decree otherwise than that the deeds were fraudulent,

and therefore void.   The evidence is so full and irresistible, that no other conclusion can be drawn from it.   *Strike's* own uniform declarations are strong evidence of the fraud, and conclusive of the fact.   There is no proof which can be relied on for the amount paid for the improvements made by *Strike* on the property.   Why did he not produce the bills, receipts, &c. This he did not do, but the vague recollection of witnesses is resorted to.   A fraudulent grantee must exhibit strong evidence of his claim.   *Piddock v Brown,* 3 *P. Wms.* 288.   *Vaughan v Lloyd,* 5 *Ves.* 48, 49.

3.  In the case of absolute fraud a court of equity will grant no relief.   The case of a constructive fraud is different—as usury, &c. where the complainant must do equity before he can obtain equity.   So also where there has been an inadequacy of price.   If *Rogers* was the complainant in this case against *Strike,* the claim of *Strike* would be allowed.   *Sands v Codwise,* 4 *Johns. Rep.* 536, 555, 582, 585, 598.   Necessary repairs—permanent and beneficial, may be allowed for; but here none have been proved to be made which are beneficial, but merely for *Strike's* own personal pride—not for convenience, but for show.   *Rob. on Fraud. Convey.* 451, *(note a.)*  *Sugd.* 525, (483.)   *Green v Winter,* 1 *Johns. Ch. Rep.* 26, 27, 39. *Moore v Cable, Ib.* 385.   The deeds being void, *Strike* held the property in trust for the benefit of the creditors of *Rogers.* He had, therefore, no right to make expensive repairs, &c. on the property.   He improved the property solely for the purpose of appropriating it to his own use.   A deed for one purpose cannot be set up for another or different purpose.   *Bridgman v Green,* 2 *Ves.* 627.   *Watt v Grove,* 2 *Sch. & Lef.* 501, 502.

*Mitchell,* on the same side.   1.  As to the form of the bill— In *Attorney-General v Whorwood,* 1 *Ves.* 538, 539, the Lord Chancellor says, that the charging part of a bill is useless—the statement or interrogatory in the bill is the essential part.   *Cooper's Plead.* 4, 9, 10.   2 *Madd. Ch.* 168.   That which is in the knowledge of the party must be positively alleged.   *Frost v Beekman,* 1 *Johns. Ch. Rep.* 302. 2 *Madd. Ch.* 168.   *Cooper's Plead.* 5.   The prayer in this bill is that the property

may be sold for the benefit of the creditors of *Rogers* and of *Rogers* and *Henderson*. The answer of *Strike* denies all fraud; by which he considered it a bill charging him with fraud, and not a bill charging it as a trust. Fraud then was put in issue, although imperfectly charged in the bill. *Cooper's Plead.* 6, 7. *Whorwood v Simpson*, 2 *Vern.* 187. 2 *Madd. Ch.* 169.

Had the complainants a right to file their bill as simple contract creditors, or as creditors at all—whether as judgment creditors, or as partnership creditors? Their claim has been admitted by *Rogers*, one of the defendants. *Strike*, the other defendant, neither admits, nor denies.

By the act of 1825, *ch.* 117, unless exceptions are taken to the report of the auditor, there can be no objection made to it in this court. Here there has been no exception taken to the report of the claim of the complainants, nor to their right to participate in the fund—there can, therefore, be no objection made in this court. But it has been said that simple contract creditors cannot come into a court of equity, unless there has been a judgment, &c. at law. This is a question of jurisdiction, and should have been raised before the defendant, *Strike*, submitted to the jurisdiction of the court by his answer. *Underhill v Van Cortlandt*, 2 *Johns. Ch. Rep.* 369. *Livingston v Livingston*, 4 *Johns. Ch. Rep.* 290. *Baugh v Price*, 1 *Wils.* 320. *Rathbone v Warren*, 10 *Johns. Rep.* 595. Equity has concurrent jurisdiction with courts of common law in cases of fraud. *Russell v Clark*, 7 *Cranch*, 89. *Taylor v Jones*, 2 *Atk.* 600. *Colt v Woollaston*, 2 *P. Wms.* 154, 156. S. C. 2 *Eq. Ca. Ab.* 482. *Stent v Bailis*, 2 *P. Wms.* 220. *Bayard v Hoffman*, 4 *Johns. Ch. Rep.* 456. 1 *Madd. Ch.* 258. *Earl of Chesterfield v Janssen*, 2 *Ves.* 155. *Barnesly v Powel*, 1 *Ves.* 289. *Wheeler v Bingham*, 3 *Atk.* 366. *Anonymous*, 2 *Desauss.* 304. *Sands v Codwise*, 4 *Johns. Rep.* 536.

An act of insolvency operates as an execution on the debtor's property, for the benefit of his creditors, from the moment the insolvent applies for the relief provided by such law. Here the insolvent debtor has executed a deed to the trustee appointed according to the insolvent laws The complainants may, therefore, call on the trustee to account for his trust, and to account for the rents and profits of the property in question. *Strike*,

as charged in the bill, is a fraudulent and colluding trustee. The creditors are *cestui que trusts*. They must be heard in equity. *Dorant v Simpson*, 4 *Ves*. 664, 665. *Taylor v Allen*, 2 *Atk*. 213. *Newland v Champion*, 1 *Ves*. 105. In an appellate court the party will not be turned out of court for preliminary objections. *Stuart v Mechanics & Farmers Bank*, 19 *Johns*. *Rep*. 506.

The defendant cannot take advantage of the complainants' right to sue, not having taken advantage of it in the court below; if it were otherwise, it would be a surprise upon the complainants. There is no question as to the right of the complainants to the fund. The point, therefore, ought not to be argued, as it is unconnected with partnership assets. At law a creditor may levy his execution on the joint or separate property of the partners. In equity it is different, until the proper fund has been exhausted. But here there are no separate creditors of *Rogers*—none appear in the record. There can then be no contest as to the joint and separate property of *Rogers*. *M'Culloh v Dashiell's adm'r*. 1 *Harr. & Gill*, 96. The schedule returned by *Rogers* under his application for relief under the insolvent laws, is no evidence that there were private or other creditors. 1 *Phill. Evid*. 51. Creditors must come in and contribute to the costs of the suit, otherwise such as do not will be excluded. Joint creditors are entitled to come in and participate in the fund *pari passu* with other creditors. *Tucker v Oxley*, 5 *Cranch*, 35. *Wats. on Part*. 172, 243. *Ex parte Elton*, 3 *Ves*. 238. *Harris v Tremenheere*, 15 *Ves*. 35. As to how creditors may come in. *Brown v Ricketts*, 3 *Johns*. *Ch. Rep*. 555. *Cockburn v Thompson*, 16 *Ves*. 327, 328. Advantage of the act of limitations may be taken by one or more creditors so coming in, against the claims of any others. *Dewdney, Ex parte*, 15 *Ves*. 496.

Have the complainants established the fraud? This question has been settled by the decree of *Baltimore* county court in 1822, from which decree there has been no appeal within the time prescribed by law. The decree was pronounced upon a final hearing, the bill, answers, &c. being submitted for that purpose. It is a final decree. 2 *Harr. Ch. Pr*. 622. An interlocutory decree does not dispose of the matters in litigation be-

tween the parties; but this decree does. The equity reserved by the decree was as to the distribution of the fund raised by a sale of the property, among the honest and *bona fide* creditors. It was not for the benefit of *Strike*, for he had no equity. The decree was final. *Ray v Law*, 3 *Cranch*, 179. 1 *Wooddison*, 232 to 240. *Thompson v M‘Kim*, 6 *Harr. & Johns.* 328. *Slee v Bloom*, 20 *Johns. Rep.* 690. *M‘Vickar v Wolcot*, 4 *Johns. Rep.* 528. The act of 1785, *ch.* 72, *s.* 27, limits appeals from the court of chancery to nine months. By the act of 1763, *ch.* 23, *s.* 5, 6, the county courts had concurrent jurisdiction with the court of chancery as to certain amounts. This jurisdiction was enlarged by the acts of 1791, *ch.* 78, 1792, *ch.* 63; and the right to appeal, and the time within which such appeal was to be made, is the same as given under the act of 1785, *ch.* 72. By the act of 1807, *ch.* 151, appeals from the decrees of county courts are limited to three years. The decree in this case was passed by *Baltimore* county court on the 28th of May 1822, and the appeal was not made until the 29th of May 1826. It is clear, therefore, that not more of the case is before this court than that part upon which the statute limiting appeals does not operate. It is possible that the decree might have been opened by a bill of review, but not otherwise. *Lashley v Hogg*, 11 *Ves.* 602. *Taylor v Popham*, 15 *Ves.* 76. *Charman v Charman*, 16 *Ves.* 115. *Waldo v Galey*, *Ib.* 214. 2 *Madd. Ch.* 454, 457, 459, 464, 466. *Earl of Darlington v Pulteney*, 3 *Ves.* 386. *Lawrence v Cornell*, 4 *Johns. Ch. Rep.* 545. What does the appeal from the court of chancery open in this case? It does not open what the chancellor considered, and what was finally acted upon before the proceedings were transferred to his court. It does not open the question of fraud; but only what was done by the chancellor. What equity was there reserved by the decree of 1822, and what can now be enforced? What is the equity which *Strike*, by his answer, shows he is entitled to? He knew of his defective title to the property, and should not have improved it; and this he should not have done independent of the fraud. A tenant for years shall not improve the property so as to prolong his possession in order to enjoy his improvements, until he is reimbursed. Equity will not relieve him by reim-

bursing him for the improvements. 1 *Madd. Ch.* 263. *Moore v Cable*, 1 *Johns. Ch. Rep.* 385. *Cootes Law of Mortg.* 66, 127, 353, 392, 561. *Hardy v Reeves*, 4 *Ves.* 471. The defendant, *Strike*, cannot be allowed for money paid on account of the opening of *Pratt-street*, and paid for taxes, &c. *Hardwicke v Vernon*, 4 *Ves.* 418. *Bennett v Murgrove*, 2 *Ves.* 52. *How v Weldon*, Ib. 517. *Strike* has no right to claim for advances of money made to *Rogers* after the deeds, for he says in his answer that he did not so advance. He would have no right if he had advanced to come in for subsequent advances in preference to *bona fide* creditors. *Jones v Smith*, 2 *Ves. jr.* 376. *Colman v Sarel*, 3 *Bro. Ch. Rep.* 12. *Anonymous*, 2 *Ves.* 662. *Baugh v Price*, 1 *Wils.* 320. There are three class of cases where relief will be granted upon the party's doing equity, as in *How v Weldon*, 2 *Ves.* 517. *Taylour v Rochford*, Ib. 282. *Smith v Loader*, *Prec. in Ch.* 80. *Barnardiston v Lingood*, 2 *Atk.* 133. *Gwynne v Heaton*, 1 *Bro. Ch. Rep.* 1. *Pickett v Loggon*, 14 *Ves.* 233. *Huguenin v Baseley*, Ib. 273. *Whorwood v Simpson*, 2 *Vern.* 186, 187. 1 *Madd. Ch.* 261. But where a deed is set aside for fraud, nothing passed to the grantee therein; and such a deed does not stand as a security for any thing. *Bennet v Musgrove*, 2 *Ves.* 52. *Sands v Codwise*, 4 *Johns. Rep.* 598. *Boyd v Dunlap*, 1 *Johns. Ch. Rep.* 482. *Sands v Hildreth*, 12 *Johns. Rep.* 494. S. C. 14 *Johns. Rep.* 497. Here *Strike* having no valid deed or title, the deed which he had being fraudulent, erects buildings on the property, belonging to another person—Can he claim to be paid for such buildings, either at law or in equity? He knew he was a fraudulent grantee, and that his deed was void; yet notwithstanding he chose to improve the property; and now has the impudence to ask to be reimbursed for such improvements. There are cases where a deed may be set aside on terms; and where the party may be allowed to redeem on payment of the consideration—as in *Herne v Meeres*, 1 *Vern.* 465. *Boyd v Dunlap*, 1 *Johns. Ch. Rep.* 482. *Murray v Riggs*, 15 *Johns. Rep.* 587. *Smith v Loader*, *Prec. in Ch.* 80. *Chapman v Tanner*, 1 *Vern.* 267. But *Strike's* claim, if admissible under any aspect of the case, now comes too late. *The Santa Maria* case, 10 *Wheat.* 431.

*Mogruder*, on the same side. The general rule in equity is, that all persons having an interest in the subject matter, must be made parties; but there is an exception in favour of creditors who may come into court at any time before the fund is distributed. *Strike* has no right to urge the rejection of the claims of the other creditors, because he is to be benefited by such rejection. But it has been said that the bill does not charge that the deeds were fraudulently obtained. If the facts in a bill are all stated, showing that there had been a fraud, it need not be stated that they had been obtained by fraud. *Jones v Slubey*, 5 *Harr. & Johns.* 372. *Farrow v Teackle*, 4 *Harr. & Johns.* 271.

Again, it has been insisted that a simple contract creditor must first resort to a court of law to obtain his claim; and if he cannot succeed there, then he may go into chancery to affect any property liable for the debt. Why drive a claimant first to law? Why not let him proceed immediately in equity? The books are full of cases where a creditor may go into chancery for himself and other creditors to obtain their claims. Fraud is equally cognizable at law as in equity, except in the case of a fraudulent will. A court of equity has jurisdiction of simple contract debts; and can bring all the parties interested as creditors, before the court, to participate in the funds in case payment is decreed. By the act of 1794, *ch.* 60, *s.* 10, the court of chancery may decree the sale of equitable estates for the payment of debts; and this power has been constantly exercised as well in this as in other states in the union. But here the debtor had applied for the benefit of the insolvent laws, and this of itself gave the complainants a right to proceed in equity. *Strike*, by his answer, put in issue the fraud in obtaining the deeds.

Again, it has been said that the deeds were *bona fide*, and for a valuable consideration. This is expressly negatived by the testimony, which is full and ample to establish that the deeds were fraudulently obtained.

Can the decree of 1822 be examined by this court on the present appeal? What followed that decree was no more than an execution of it—similar to an execution on a judgment at law. After the sale by the trustees, that decree was satisfied. *Thomp-*

*son v Brown,* 4 *Johns. Ch. Rep.* 631.    Matters of form are dispensed with, but matters of substance are required.    *Moore v White,* 4 *Harr. & Johns.* 549.    The attempt on this appeal is to reverse a decree which has been executed.    If this were permitted, so long as a final distribution is incomplete, the party may appeal from the decree which may have passed twenty years before.

. Is *Strike* entitled to be refunded any money which he may have paid, no matter for what purpose?    There is no question whether the defendant, *Strike,* should be entitled to have his account stated, there being no objections made to it.    Nor is there any whether or not the complainants are creditors of Ro-.gers.    Their claim has not been disputed.    This court will not, therefore, notice any exceptions or objections now made, unless they were also made in the court below.    There is no proof that *Strike* advanced any money to Rogers, either before or after the deeds; but certainly none that he advanced any money before the deeds.    The question is, whether any allowance should be made to *Strike* for improvements under the circumstances of the case?    We think no allowance ought to be made to him.    *Moore. v Cable,* 1 *Johns. Ch. Rep.* 385.    *Bostock v Blakeney,* 2 *Bro. Ch. Rep.* 653.

The answer of Rogers is evidence against, but not in favour of *Strike,* who claims under Rogers.    *Field v Holland,* 6 *Cranch,* 25.    *Phill. Evid.* 265, 266.    *Bridgman v Green,* 2 *Ves.* 629.

*Wirt,* (Attorney General of *U. S.* ) in reply.    This suit is in fact the suit of *Rogers,* though brought by M'*Donald* and *Son,* as complaining creditors.    It was a fraud upon the court in moving that Rogers should have himself examined as a witness. He swears that he considers this his suit—there was a combination .between M'*Donald* and *Rogers* as to the manner of bringing the suit—the payment of the expenses thereof, &c. Here the complainants, and one of the defendants, combine together to cheat the other defendant.    Rogers must be considered the complainant, and the same rules of law are to be applied to him as if he was the complainant on record.    The essential plaintiff in a cause is he who conducts the suit and pays the costs.

What part of the proceedings are now to be considered by this court? Can the court look into the decree of 1822? It has been contended, on the other side, that this court cannot, there being no appeal in time. The chancellor considered himself the very court by whom the decree was pronounced, and he would not disturb it. Does the act of assembly limiting appeals, apply to final decrees only, and to discretionary appeals from decretal orders or interlocutory decrees? The decree of 1822 must be considered as justifying an appeal from it if the party choose to appeal; but the party was not bound to appeal then, but might wait the final decree to be made, before he appealed. It is a privilege given to the party to appeal or not, until a final decree is pronounced. On an appeal from a final decree, the appellate court goes back to all interlocutory orders or decrees which took place in the action. It is the policy of the court to discountenance so many appeals, when one would answer every purpose. It would otherwise be making one case the mother of many appeals. *Thompson v M'Kim,* 6 *Harr. & Johns.* 302 *Snowden v Dorsey, Ib.* 114. It is often difficult to draw the line where the appeal may be made, and where it should not. The party must appeal to ascertain whether or not it was a case proper for an appeal. Should he not appeal, he might be precluded, at the time of the final decree, from showing that the interlocutory decree should not have passed. All this may be easily obviated by permitting the party to wait the event of the suit, and then appeal from all that had taken place, and urge any errors apparent on the record. *Atkinson v Manks,* 1 *Cowan's* Rep. 702. *Norwood v Norwood,* 2 *Harr. & Johns.* 241. But it has been said that the decree of 1822 was a final decree. How can it be said to be final when it does not put an end to the suit, or the cause off the docket? The decree of 1822 did nothing more than annul the deeds, and direct a sale of the premises. Nothing is said about the allowance, &c. if any, to be made to *Strike.* These were questions belonging to the cause. As to what is a final decree the court are referred to *Hind's Ch. Pr.* 429. *Aldridge v Giles,* 3 *Hen. & Munf.* 136. 3 *Tucker's Blk.* 423. *President, &c. of William & Mary College v Lee,* 2 *Hen. & Munf.* 558. *(note).* M'*Call v Peachy,* 1 *Call's* Rep. 55. *Goodwin v*

*Miller,* 2 Munf. 42. *Chapman v Armistead,* 4 Munf. 382. *Paynes v Coles,* 1 Munf 373. The act limiting the time of appealing runs from the time of the final decree, and not from any interlocutory order or decree.

It has been said that we cannot object to any thing which is waived by the answer. If the bill does not on the face of it, make out a case, the court will not sustain it. It requires neither a plea nor demurrer to a bill, where it does not make a proper case of itself. If the court discover that all the proper parties are not before the court, they will not decide the case. Here the claim of the complainants is against *Henderson* and *Rogers,* and the bill is against *Rogers* individually. *Henderson* should have been made a party. The complainants could not single out either *Henderson* or *Rogers.* At law the want of proper parties must be pleaded, but in equity it need not.

The complainants are simple contract creditors, who have no judgment at law, but taking the first step in a court of equity for recovering their claim against the debtor's land. Has a court of equity jurisdiction of the case? The cases cited on the other side are all cases of collusion, fraud, &c. It is not too late now to object to the jurisdiction of a court of equity in this case. *Wheeler & M'Attee v Johnson,* decided at the present term. *Pollard v Patterson,* 3 *Hen. & Munf.* 67. A creditor must ascertain his claim at law before he can go into equity, if fraud stands in the way of his getting his debt paid.

There is no case of fraud either by the bill, or proof sufficient to justify the decree. The bill must allege that the complainants are defrauded by the deeds they seek to annul. Here the bill does not allege the deeds to be fraudulent conveyances. It is an equivocal bill. Suppose the bill is free from all exceptions, does the evidence make out a case of fraud against *Strike?* The answer, testimony and declarations of *Rogers* are not evidence against *Strike,* and if stricken from the case as not evidence, there is nothing left of a shadow of fraud. The answer of *Strike* has not been overthrown by any testimony in the cause. There are not two positive witnesses impeaching the answer. His answer is to a bill of discovery, and is entitled to greater weight than an answer in an ordinary case. The whole of *Rogers's* evidence, if taken into the case, does not

prove fraud in *Strike*. Rogers being considered as plaintiff, his evidence operates against him, and cannot be used in favour of the complainants; but *Strike* may use it for his benefit, if he thinks proper. Where one defendant claims under his codefendant, the answer of one is evidence against the other; but in the alleged case of turpitude it is not so. Besides here, Rogers is in fact a complainant. Rogers, in his answer, says the deeds were to shield the property from being liable for the debts of *Henderson*, which fell upon the firm of *Henderson* and Rogers. So is the evidence of three other witnesses, to whom *Rogers* had applied to take a deed of the property. This shows that the deeds were not intended to defraud the complainants of their debt. If the deeds were not to defraud the very creditors who go to vacate them, they are not void. It must be charged in the bill, and proved that the deeds were to defraud the complainants. The statute of 13 *Elizabeth* does not look to any such intention, upon which to ground a fraud in a case like this. The deeds were intended to protect the property against debts for which it was not liable. They cannot, therefore, be considered as void—not being to defraud any real creditor.

If the decree of sale be right, yet the complainants, to be entitled to equity, must do equity before they can recover their claim. In *England* no relief is granted where deeds are set aside, &c. unless upon the ground of replacing the party where he was before the deeds were executed; and this, too, in cases of atrocious frauds. The case of a creditor makes no distinction. These complainants could not have relief, except upon *Strike* being paid for all advances, improvements, &c. At law it would be different. A plaintiff having a judgment might levy an execution on the property fraudulently conveyed, and the fraudulent grantee has no redress. But in equity it is otherwise; there the claimant must do equity in order to entitle him to obtain it. There is no distinction between a creditor complainant, and a grantor complainant, on either going into a court of equity to have a deed set aside. The fraudulent grantee must be placed in the situation he was orginally. *Watt v Grove*, 2 *Sch. & Lef.* 501. *Herne v Meeres*, 1 *Vern.* 465. It has been said that there is a distinction between an absolute and constructive fraud. In the first case the fraudulent grantee has no

relief, but in the latter he is to be reimbursed for all advances, &c. Are the deeds in this case absolutely fraudulent? As to the distinction between absolute and constructive fraud, the court are referred to *Rob. on Fraud. Convey.* 451, (and note a.) There is no distinction between covin and fraud; and equity never considers whether a deed be void or voidable—that is done at law. A deed cannot be set aside *in part* for fraud—it must be *in toto.* 1 *Madd. Ch.* 262. The meaning of this is fully explained in *Middleton v Lord Kenyon,* 2 *Ves. jr.* 408. *Lawley v Hooper,* 3 *Atk.* 281. In general, where a deed is set aside on account of fraud, it must be on terms. 1 *Madd. Ch.* 331. *Wharton v May,* 5 *Ves.* 69. *Purcell v M'Namara,* 14 *Ves.* 106. *Pickett v Loggon, Ib.* 244. As to the extent of relief in such cases, see *Rob. on Fraud. Convey.* 526. *Sugd.* 483. *Barnewell v Barnewell,* 3 *Ridgw. P. C.* 61, 66.

In *Sands v Codwise,* 4 *Johns. Rep.* 536, 555, 585, a new equity law is established in the state of *New-York,* different from the equity law of *England. Attorney-General v Vigor,* 8 *Ves.* 283.

*Curia adv. vult.*

EARLE, J. at this term, delivered the opinion of the Court. This cause originated on the equity side of *Baltimore* county court, and was removed to the court of chancery, under the provisions of the act of 1824, *ch.* 196, where it received a final determination. On the 28th of May 1822, the county court expressed an opinion, that the deeds of the 16th of January 1811, from *Rogers* to *Strike,* mentioned in the proceedings, were executed for the purpose of defrauding the creditors of *Rogers,* and without *bona fide* consideration, and ordered, adjudged and decreed, that the said deeds were null and void as against the complainants; and further ordered, adjudged and decreed, that the property therein contained be sold, and that *Henry W. Rogers* and *Samuel Moale* be appointed trustees, for the purpose of making the sale. And all equities as to the distribution of the proceeds of sale, were reserved by the court for hearing, on the trustees' report, or bringing into court the money or securities arising on the sale. The auditor then stated an account, which was excepted to by

both parties; but the exceptions were not acted upon before the case was transferred to the court of chancery, where it made its appearance in October 1825. It was argued at large upon its merits at March term 1826, and on the 10th of April following, the chancellor referred it to the auditor in chancery, to state an account, having in view the explanations, determinations and directions, made and given by him; and he overruled the former auditor's statements and reports, so far as the same were inconsistent with his then determinations and directions. Pursuant to these directions of the chancellor the auditor stated and reported two accounts. One between the estate of *Rogers* and the trustees, and the other between *Strike* and the same estate. And in the last account, *Strike* is charged with rents and profits, to a large amount, and has received no credit or allowance for necessary and permanent improvements, taxes, ground rent, or sums assessed for the extension of *Pratt street.* To this report he took many exceptions, all of which the chancellor overruled, and by his order of the 15th of May 1826, the report and statements of the auditor were ratified and confirmed; and the trustees were directed to apply the proceeds accordingly, with the interest that had been, or might be received. And the chancellor further ordered, that *Strike* pay to the complainants $5907 01, with interest thereon from the 14th of September 1822 until paid, with the costs, not included in the report of the auditor, to be taxed by the register.

From these several decrees and orders *Strike* appealed to this court, and they present the subjects which are now to engage our attention.

The appeal from the decision of the county court of the 28th of May 1822, has given rise to a point in this court, that could not have arisen before the chancellor. It has been made a question, whether that appeal was taken within the time prescribed by the acts of assembly. It was taken on the 29th of May 1826, and when more than three years had elapsed from the time of making the decision. For *Strike* it was strenuously argued, that it was not a final decree, and therefore not within the operation of the act of 1807, *ch.* 151; while his opponents' counsel as warmly urged it to be a final and conclusive judg-

ment; and that if considered a decretal order only, the appeal was equally barred by length of time.

Our examination of this point has been anxious and diligent, and it has conducted us to the conclusion, that it is unnecessary to determine on the nature of the decision; for whether it is a final decree, or only a decretal order, the appeal from it appears to have come too late. If viewed as a decretal order of *Baltimore* county court, it should have been appealed from within nine months from the time of making it, by the terms of the act of 1785, *ch.* 72, *s.* 27. This act was passed long before the enlargement of the equity jurisdiction of the county courts; but when that jurisdiction, within the legitimate sphere of its operation, was made concurrent and co-extensive with the powers of the court of chancery, it necessarily took with it all the laws and regulations relating to equity matters in that high tribunal, and among others, it carried with it all the provisions of this act of assembly. It must then be considered on a footing with a decretal order in the court of chancery, which is to be appealed from within nine months from the time of making it. This is not a permissive privilege, as was said in argument, to be exercised or not in the election of the party, and to be postponed at his pleasure until the final decree. The law is imperative, and the alleged error, if insisted on, must be appealed from within nine months from the time of making the order, and not afterwards.

The phraseology of the act is too plain to be mistaken, and whatever inconveniencies in practice our construction of it may produce, it is conceived it can be made to bear no other. With all our research we have been unable to light upon a case where our courts have given to the act a more convenient interpretation; and we confess we should have been much relieved, if such an adjudication could have been found to have been made by them. We would willingly have taken it for our guide, and made it the foundation of our judgment. But in the absence of an adjudged case, we feel that we are bound to construe the act agreeably to its language; and it in terms is, that the appeal be made within nine months from the time of making the decision appealed from, and not afterwards.

The disposition thus made of the question on the time of the

appeal, makes it unnecessary to examine into several points discussed before us. They were suggested by the proceedings anterior to the decision of the 28th of May 1822, and in strictness were improperly brought into the argument. Excluding them from our consideration, it only remains for us to express in general terms our entire approbation of the steps pursued by the chancellor in the case, after it was transferred to his court. He very properly viewed all the proceedings as having taken place in the same tribunal, and treating the decree of May 1822 as a final decree, he went on to settle and complete what it left undetermined. The complainants' bill prayed that the defendants might be made to account for rents and profits; and on the 10th of April 1826, he referred the case to the auditor to state an account, including rents and profits, with other matters in the cause. In this he was clearly right. The decree had established the fraudulent conduct of the defendants, and vacated the deeds from the one to the other; and surely if *Strike's* possession of the property conveyed commenced in fraud, his continuation of that possession partook no less of the same illicit character; and it may be well received as a settled principle of equity, that whosoever comes into the possession of an estate by fraud, must account for rents and profits, when the fraudulent conveyance is vacated and set aside.

The further directions of the chancellor to reject from the account allowances for advances and improvements made by *Strike*, we think also perfectly correct. The reserved equities of the decree had no view to the interest of *Strike*; and the deeds having been annulled, because they originated in a fraudulent combination to cheat the creditors of *Rogers*, they are to be considered void *ab initio*, and wholly wanting in legal fitness to stand as securities for any advances whatsoever. They have, in truth, no lawful existence; and to use the words of an eminent civilian, "it would be inconsistent and absurd to recognize them for any lawful purpose." The quoted passage of *Sugd.* 525, furnishes a sound practical rule for rejecting claims for improvements, where the transaction is tainted with fraud. It is expressed nearly in these words: If a man has acted fraudulently, and is conscious of a defect in his title, and with that con-

viction on his mind, expends a sum of money in improvements, he is not entitled to avail himself of it. Its just application to *Strike's* situation is too obvious to be enlarged upon. His deeds from *Rogers* were grossly fraudulent in fact, being made under corrupt motives to cheat, and his improvements were made soon after, while his conscience was broad awake to his title, and his mind probably engaged in contrivances to escape detection.

The chancellor's last order of the 15th of May 1826, ratified the auditor's statements and report, made in conformity to his directions, and by it *Strike's* numerous exceptions were properly overruled.

DECREE AFFIRMED.